Madeline L. COHEN

v.

COMMUNITY COLLEGE OF PHILADELPHIA.

Monica SOKOLSKY

v.

COMMUNITY COLLEGE OF PHILADELPHIA.

Jan S. COWARD

v.

COMMUNITY COLLEGE OF PHILADELPHIA.

Civ. A. Nos. 75–2133 to 75–2135.

United States District Court,
E. D. Pennsylvania.

Jan. 29, 1980.

**413**

were victims of so-called "reverse discrimination" because they had been denied full-time faculty positions in favor of allegedly less-qualified minority candidates.

After receiving the requisite notices of right to sue from the EEOC, plaintiffs each filed timely complaints in this court, seeking relief under Title VII. The cases were consolidated for a trial before the court, without a jury, producing a record of more than 1200 pages.

After considering the evidence at great length, as well as the briefs of counsel and the prevailing case law, I conclude that plaintiffs have failed to show a violation of Title VII. The relief sought must therefore be denied.

In connection with this holding, I make the following:

## I. FINDINGS OF FACT

1. CCP is a public college providing, *inter alia*, a two-year, post-secondary, college-parallel education from its principal campuses located at 34 South 11th Street and 1600 Spring Garden Street, Philadelphia, Pennsylvania.[1]

2. CCP was organized and exists pursuant to the Community College Act of 1963, 24 P.S. § 5201 et seq. ("Act"). The Act governs CCP's operations.

3. CCP opened in September, 1965, after the passage of an enabling ordinance by the City Council of Philadelphia in 1964.

4. CCP is administered and supervised by a Board of Trustees appointed by its local sponsor, the City of Philadelphia (24 P.S. §§ 5205, 5206).

5. CCP's operating funds are derived from the following sources: one-third student tuition (24 P.S. § 5209); approximately one-third from the Commonwealth of Pennsylvania (24 P.S. § 5214(b)); and the balance from the City of Philadelphia (24 P.S. § 5214(a)). The Commonwealth pays up to one-half of CCP's annual capital expenses as approved by the Department of Public Instruction (24 P.S. § 5214(b) and (c)).

Richard D. Malmed, Philadelphia, Pa., for plaintiffs.

Howard R. Flaxman, Philadelphia, Pa., for defendant.

## ADJUDICATION

DITTER, District Judge.

The plaintiffs in this case were employed as teachers by the defendant Community College of Philadelphia (CCP) in part-time capacities for varying periods of time between 1970 and 1975. In 1974, all three plaintiffs were denied appointment to full-time positions on defendant's faculty. Each of the plaintiffs filed complaints with the Equal Employment Opportunity Commission (EEOC), alleging that they had been refused employment because of their race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. Essentially, plaintiffs charged that they

1. Many of these findings are adopted from a stipulation of facts agreed upon by counsel.

6. CCP maintains seven divisions consisting of approximately 23 academic departments with courses of instruction in approximately 47 separate curricula.

7. CCP's faculty consists of three categories: full-time, visiting lecturers, and part-time.

8. Full-time faculty members are tenure track employees divided into eight ranks. At all times relevant hereto, the relationship between CCP and its full-time faculty was governed by a collective bargaining agreement (Exhibit 1) effective October 20, 1972, to August 31, 1975, between CCP and the Faculty Federation of the Community College of Philadelphia, Local 2026, of the American Federation of Teachers, AFL–CIO. ("Federation").

9. Visiting lecturers also teach full-time, but for a stated period of time (usually one or two semesters), without any obligation on the part of CCP to renew their services. Part-time faculty members are those teaching less than nine credit hours per semester. The visiting lecturers and part-time instructors are not subject to a collective bargaining agreement.

10. Plaintiffs applied for appointment as full-time faculty members in the Department of Music and Art in the Division of Humanities and Applied Arts for the 1974–1975 academic year.

11. In prior semesters, plaintiffs had served as either visiting lecturers or part-time instructors.

12. Initial appointments for full-time faculty positions were governed by Article VI A(1) of the Collective Bargaining Agreement which stated in part:

Responsibility for initiating recommendations for hiring shall normally vest with the members of the department where a newly hired Employee will be working. In any case, all recommendations for the hiring of new employees in a department shall be subject to the consideration and approval first of the Department Committee elected by the department, next by the Department Head, and then by the Division Director and by the Provost.

The Department Head and Department Committee shall be required to provide (a) a list of all applicants rejected; and (b) upon the request of the Provost, a written statement explaining any specific rejection. Final decisions with respect to the appointment of any new Employee shall be made by the Board upon the recommendation of the President and an appointment shall normally be for a term of one (1) year.

13. At all times relevant hereto, the president was Dr. Allen T. Bonnell, ("Bonnell"), the provost was Dr. Raymond Pietak, the director of the Division of Humanities and Applied Arts was William Baker, and the department head of the Department of Music and Art was Clayton White. Due to the differing natures of the disciplines, there were two departmental hiring committees, one for music and one for art. The members of the art hiring committee were Bobbye Burke and R. Daniel Evans. The members of the music hiring committee were Clayton White, Leon Silvan, and Brian Kovach.

14. It was necessary for the music department to hire for the academic year 1974–1975 in that CCP had approved a separate expanded music curriculum to commence in the fall semester 1974. (N.T. 8–26, 27, 10–43 to 10–45).

15. Although there was a need for new instructors who could teach in a number of areas, there were particular needs for specialists in theory, history, ethnomusicology, and piano. (N.T. 8–28).

16. The hiring committee in music met to consider the applications of various candidates. On April 25, 1974, the committee recommended to the division director the hiring of Joy Simpson ("Simpson") (Exhibit 28).

17. Plaintiffs Jan Coward ("Coward") and Monica Sokolsky ("Sokolsky") joined with the hiring committee in recommending Simpson. (Exhibit 28).

18. Coward had received a B.M. (1965) from East Carolina University and a M.M. (1971) from the University of North Caroli-

na. He had been employed as either a visiting lecturer or part-time instructor at CCP from January, 1972.

19. Sokolsky had received a B.F.A. (1968) from Carnegie-Mellon University and a M.M. (1970) from Temple University. She had been employed as either a visiting lecturer or part-time instructor from September, 1970.

20. Simpson had received a Bachelor of Music Education (1968) from Temple University and a M.M. (1972) from the Julliard School (Exhibit 34).

21. As an undergraduate she majored in piano and voice education and majored in voice in her masters studies at the Julliard School. Simpson had an outstanding record as an opera singer as well as considerable experience as a secondary school music teacher. She had been involved during the 1973–1974 academic year as assistant director of the CCP choir. (Exhibit 34, N.T. 9–2 to 9–10).

22. In August of 1974, Simpson had promise to be, at the least, a greater asset to the music department at CCP than Jan Coward. (N.T. 5–87).

23. In late August of 1974, CCP extended a job offer to Simpson. She was at least as well qualified for this job as were both plaintiffs Sokolsky and Coward.

24. CCP could reasonably conclude that Joy Simpson was better qualified for the position than either Sokolsky or Coward, given her qualifications and the needs of the college.

25. In August, 1974, the music hiring committee continued to meet and sent a series of memoranda to the division director recommending the hiring of candidates (Exhibits 29–31). (Stipulation of Facts ¶ 22).

26. CCP hired Simpson, Horatio Miller ("Miller"), and Dr. George Starks ("Starks") for the music positions rather than plaintiffs Coward and Sokolsky. (Stipulation of Facts ¶ 23).

27. Starks had received a B.S. (1964) from North Carolina A & T State University, M.S. in Music Education (1965) from the University of Illinois, and a Ph.D. in Ethno-

musicology (1973) from Wesleyan University (Exhibit 35). (Stipulation of Facts ¶ 28).

28. Starks doctoral studies were in ethnomusicology with particular emphasis, including his dissertation, on Afro-American music. He had taught at the college level since 1965 at Coppin State College, Baltimore, Maryland, Wesleyan University, and Howard University. (Exhibit 33).

29. Miller had received a B.A. (1970) from the University of Pennsylvania and a M.M. (1973) from Temple University (Exhibit 35). (Stipulation of Facts ¶ 27).

30. Miller's undergraduate major was in musicology and his master's studies in piano performance. He had taught at the college level as both an instructor and graduate assistant at Temple University and Cheyney State College. He was considered to be an outstanding young pianist, and at the time of hire had recently been chosen by the Soviet Union to be a participant in the Tchaikovsky International Music Competition. (Exhibit 35, N.T. 7–58 to 7–63).

31. Starks fulfilled CCP's need for an ethnomusicologist, Simpson fulfilled CCP's need for an instructor in theory and aural training, and Miller fulfilled needs in piano and history. (N.T. 7–69; 8–42; 8–49; 9–13).

32. CCP could reasonably conclude that Starks, Simpson and Miller were the most qualified candidates for the jobs considering their education, backgrounds, experiences, and CCP's needs. (N.T. 9–90 to 9–92; 10–45 to 10–58; 5–85, 86; 8–40; 8–43).

33. The art hiring committee after drafting criteria (Exhibit 11) and advertisement (Exhibit 10), received twenty applicants and interviewed seven candidates for a position in art. On July 30, 1974, the hiring committee recommended to the department head, Clayton White, plaintiff, Madeline Cohen ("Cohen") as their first choice, and Jacqueline Brown ("Brown") as their second choice (Exhibit 13).

34. As reflected in the job advertisement (Exhibit 10) the hiring committee was seeking candidates with masters degrees

and teaching experience with expertise in teaching survey of western art and African and Afro-American art. These priorities were expressed to the department head and division director. (N.T. 7–145, 146, 10–21, 22).

35. African art had been taught as part of the primitive art course. However, there was considerable student demand for courses dealing with both African art and Afro-American art, which had never been taught at CCP. (N.T. 2–78, 3–79, 80, 7–144, 146, 10–24).

36. The hiring criteria utilized by the hiring committee required an M.A. in art history from an accredited graduate school, a strong commitment to undergraduate teaching, an ability to teach the introductory survey course, and the ability to teach (or a prediction of successful teaching of) a course in non-western art. Ability to teach non-western art could be demonstrated by teaching experience in that area or completion of undergraduate or graduate courses in the specific area and the ability to organize and prepare a new course offering in one of these areas. (Exhibit 11).

37. Brown had obtained a B.A. degree (1969) from Spelman College and an M.A. (1974) from Howard University (Exhibit 14).

38. Brown had majored in art at undergraduate school and her masters work was in art history with emphasis and concentration in African and Afro-American art. She had served as an instructor in art at L. J. Price High School, Atlanta, Georgia, design instructor at Federal City College; lecturer in African studies, Museum of African Art, Washington, D.C.; instructor in art, Washington, D.C. Public School System, and a graduate assistant at Howard University (Exhibit 14, N.T. 7–100 to 7–102). By background and education, Brown satisfied all the hiring criteria. (N.T. 2–100, 102, 3–91, 8–12, 10–35, 36).

39. When interviewed by the hiring committee, Brown distributed to the committee and discussed with them a syllabus for a proposed Afro-American art course. (Exhibits 15–16, N.T. 2–97, 3–93).

40. Cohen had obtained a B.A. degree (1966) from Brooklyn College, an M.A. (1970) from the University of Pennsylvania, and was taking courses towards a Ph.D. at the University of Pennsylvania. She had been employed at CCP as either a visiting lecturer or part-time instructor from September, 1972. (N.T. 2–4 to 2–10).

41. Cohen majored in both mathematics and art history as an undergraduate, her masters work centered on painting, sculpture, and architecture with her thesis in modern art. Her doctoral work emphasized architecture and urban history. Her proposed dissertation was in architectural history. (N.T. 2–4 to 2–10).

42. Prior to making any hiring decision, both Baker and White reviewed Cohen's transcripts, checked with the University of Pennsylvania as to course offerings, and consulted an expert on African art, Dr. Donaldson, to ascertain whether Cohen's academic preparation in Islamic architecture was sufficient to teach African and Afro-American Art. (N.T. 8–7, 9, 8–13, 8–18, 9–19, 20, 9–23 to 9–27, 10–29, 30, 10–35).

43. CCP could reasonably conclude that Cohen did not satisfy the hiring committee criteria in that she had no academic preparation in the area of African or Afro-American Art. (Exhibit 11, N.T. 2–4–2–10, 2–41, 2–94–2–97, 2–114, 3–83–3–84).

44. Cohen did not indicate a desire, ability or willingness to teach Afro-American Art until after final candidate selection had been made. (Exhibit 26, N.T. 2–40–41, 3–92–93).

45. CCP could reasonably conclude that Brown was the most qualified candidate for the job considering her education, background and experience, as well as CCP's needs. (Exhibit 12, N.T. 10–35, 10–38–10–42).

46. CCP hired Brown for the art position.

47. Simpson, Miller, Starks, and Brown are black, and Coward is a white male, Cohen is a Russian Jewish female, and Sokolsky is a Slovak-Russian Catholic female.

48. Clayton White made certain remarks which conveyed the impression to several people that Dr. Bonnell would only hire blacks, that CCP was under pressure to hire minorities, and that employment prospects for white persons at CCP were very discouraging. (N.T. 2–133; 3–17 to 3–19; 3–21; 6–48; 5–72).

49. Clayton White had no hiring authority. Rather, he could only make recommendations. He had no authority to bind the college by his statements regarding hiring.

50. No witness testified to hearing anyone other than Clayton White make remarks similar to those described in Finding No. 48.

51. Mr. White's statements were in fact inaccurate. See Finding No. 85.

52. Before the recommendation to hire Simpson (Exhibit 28) was submitted, Clayton White discussed with the other members of the music department, including Sokolsky and Coward, the possibility of using "ringers" or "bogus candidates." (N.T. 2–134, 135; 3–116, 117; 5–76, 77; 6–56, 57; 8–31).

53. A "ringer" would be a minority candidate who actually had no interest in a job at CCP. The purpose of the "ringer" idea was to facilitate the hiring of Sokolsky and Coward. The committee would submit the names of "ringer" candidates along with those of Sokolsky and Coward. The "ringers" would then withdraw at the last moment, leaving CCP no time to find other candidates. CCP would then be forced to hire Sokolsky and Coward. (N.T. 2–135; 5–77; 6–56).

54. The "ringer" possibility was discussed solely as a theory or a hypothetical. It was never agreed to as a plan of action, and it was never carried out. (N.T. 5–76; 6–7; 8–31).

55. In order to succeed, a plan based on the "ringer" theory would require the knowledge and cooperation of the "ringer" candidates themselves.

56. Although plaintiffs Sokolsky and Coward were both present for Joy Simpson's interview, the possibility of Simpson's being a "ringer" was not discussed. (N.T. 3–26).

57. Neither Clayton White nor anyone else ever told plaintiffs that Joy Simpson was in fact a "ringer." (N.T. 3–26, 27).

58. No one ever told plaintiffs that Joy Simpson was paid for rendering services as a "ringer," nor were they ever told that any "ringers" were to be paid. (N.T. 3–27, 28).

59. No other persons were ever identified to plaintiffs as either potential or actual "ringers." (N.T. 3–28, 29).

60. Plaintiffs Sokolsky and Coward had no reasonable basis for believing that Simpson was a "ringer" or anything other than a legitimate candidate when they joined in the hiring committee's recommendation. (Exhibit 28).

61. Sokolsky and Coward have never retracted their recommendation of Simpson. There is no claim that Sokolsky and Coward only joined in recommending Simpson because they thought she was a "ringer."

62. In fact, Simpson was well qualified for a full-time position at CCP.

63. Plaintiffs each filed timely complaints with the Equal Employment Opportunity Commission ("EEOC") as a result of their failure to be hired as full-time faculty members for the 1974–75 academic year. These actions were filed within 90 days after receipt of Notice of Right to Sue from the EEOC.

64. Each plaintiff taught at CCP as a part-time instructor during the 1974–75 academic year. Cohen taught as a visiting lecturer during the fall 1975 semester and by choice taught part-time during the spring 1976 semester until she voluntarily resigned on March 8, 1976.

65. The complaints in these actions were filed on July 28, 1975.

66. On August 20, 1975, the music hiring committee met. The committee consisted of White, Starks, Miller, Kovach, and Silvan (Stipulation of Facts ¶ 33).

67. White, Starks, and Miller were upset and offended by the language in the complaints filed by Sokolsky and Coward. (N.T. 4–81 to 4–84; 6–29, 30).

68. Clayton White remarked that people who would make such charges were not fit to teach at CCP. (N.T. 6–30).

69. Sokolsky and Coward received the two highest ratings of all the available candidates for any openings in the music department for the 1975–76 academic year. (Exhibit 41; N.T. 4–84).

70. Nevertheless, the committee voted not to offer even part-time or guest lectureship positions to Sokolsky and Coward. This action occurred as a direct result of the discrimination charges made by plaintiffs. (N.T. 4–83; Exhibits 42 and 43).

71. The minutes of the committee meeting specifically reflect a decision not to offer Sokolsky and Coward employment until this suit was settled. (Exhibits 42 and 43; see also N.T. 4–83).

72. At that time, Sokolsky and Coward had been teaching at CCP in part-time and guest lectureship capacities for approximately four years.

73. CCP maintained an affirmative action program for hiring which is outlined in a memo dated June 2, 1972, from Bonnell to Drs. Pietak and Sherwood and Mr. Breen (Exhibit 2).

74. The memo setting forth the affirmative action program (Exhibit 2) reads in its entirety as follows:

It has been both the determination and the official policy of Community College of Philadelphia that every possible effort shall be exerted to enroll students and recruit faculty and staff who are appropriately representative of the constituencies we serve.

At the Board meeting on June 1, 1972 the Trustees unanimously reaffirmed this policy. Since statistical data indicate less success in developing a faculty representative of constituencies served than in recruiting students, the President was instructed to require of all committees, offices, and officers of the College who are responsible for the recommendation of personnel to be hired, submission of:

a. Evidence that there is a deliberate, consistent practice of seeking as candidates for consideration for potential openings representatives of minority groups in the community; and

b. Information regarding the methods used to identify candidates from minority groups and specifics regarding the candidates identified, whether recommended for appointment or not.

By authority of the Board of Trustees, only the President may make contractual commitments to candidates for vacancies. Effective immediately, the President will sign no further contracts for personnel recommended by the several offices through whom appointment recommendations are channeled unless the recommendation is accompanied by additional information representing evidence of compliance with the requirements set forth in items (a) and (b) above.

We have both a moral and a legal responsibility in this matter. I feel confident that I can count on your full concurrence and cooperation.

75. The plan set forth in Finding No. 74 was in fact the plan utilized by CCP.

76. On January 16, 1974, a meeting took place between Bonnell and executives of the Federation. In attendance were Bonnell, Frank J. Skahill, his assistant for personnel, and union officials, Henry Swezey, Karen Schermerhorn, Richard Clark, and Nancy Logan. Affirmative action in hiring was discussed at this meeting.

77. At this meeting Bonnell reaffirmed and restated CCP's affirmative action plan (Exhibit 2) to those present. He emphasized the need to recruit more qualified minority faculty members and to make greater efforts to seek out actively minority candidates.

78. A further meeting was held with the Federation executives on May 8, 1974, at which affirmative action in hiring was again discussed. Once again it was emphasized that broad based recruiting was necessary, but that qualified non-minority candidates could be hired.

79. On June 3, 1974, Bonnell sent a memo to Dr. Pietak on minority hiring,

copies of which were distributed to all division directors (Exhibit 3).

80. In the memo Bonnell emphasized that no candidate for a regular full-time position would be rejected or accepted solely on the grounds of race, sex, ethnic origin, or religious preference. He emphasized that in hiring " . . . competence in a given academic discipline is, of course, expected; but the 'best' candidate is one who also complements the other personnel of the College and improves the total ability of CCP to fulfill its mission" (Exhibit 3).

81. CCP's affirmative action policy was designed to be in compliance with guidelines established by the Department of Health, Education and Welfare, 37 Fed. Reg. 24687 (1972), and Article VI A(2) of the Collective Bargaining Agreement (Exhibit 1) which states: "Recognizing the needs of the students and of the wider community, the Federation and the Board shall encourage members of minority groups to apply for available faculty positions at the College."

82. It was never the policy of CCP to hire less qualified minority group members over more qualified candidates.

83. CCP never imposed formal or informal quotas or goals for minority hiring.

84. As of December, 1972, there were 18 black full-time faculty members on a 209 person faculty. As of December, 1973, there were 20 black full-time faculty members on a 205 person faculty (Exhibit 6).

85. For the academic year in question, 1974–1975, there were 35 people hired as full-time tenure track faculty members. Of those hired 21 were caucasian, 13 black, and one oriental (N.T. 7–15, 16).

## II. DISCUSSION

This case presents me with the difficult task of deciding when a public college's effort to aid a disadvantaged class of persons becomes an invidious discrimination against another class or group. Essentially, plaintiffs have approached this case on two levels. First, they argue that they have been individually discriminated against because they were each denied employment solely on account of their race. Plaintiffs argue that this is a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and they seek relief under the provisions of that statute. To this extent, their case is similar to the countless lawsuits alleging racial discrimination in employment that come to the federal courts under Title VII on virtually a daily basis.

As an adjunct to their individual claims, plaintiffs Sokolsky and Coward have charged that following their denial of full-time employment, they were also refused part-time positions at CCP in retaliation for their efforts to vindicate their rights under Title VII. The retaliation charge was added by an amended complaint. Relief here is sought under 42 U.S.C. § 1985(2), as well as under Title VII, 42 U.S.C. § 2000e–3.

Second, plaintiffs challenge the validity of the affirmative action plan utilized by CCP for the purpose of increasing minority representation on its faculty. They argue that this plan establishes an illegal quota system which gives an undue preference to minority individuals, primarily blacks. Plaintiffs submit that the decisions not to offer them full-time employment were made in furtherance of this illegal plan, and were therefore also illegal.

After reviewing the evidence and the arguments of counsel with great care, I conclude that plaintiffs Sokolsky and Coward were indeed retaliated against for their actions in filing formal charges of discrimination against CCP. To this extent, I will award appropriate relief.

In all other respects, however, relief must be denied because plaintiffs have failed to sustain their burden of proof. Plaintiffs have not proven that they were denied employment on account of their race, nor have they shown CCP's affirmative action plan to be illegal.

### A. Plaintiffs' Individual Cases

As noted above, to the extent that plaintiffs claim simply to have been denied employment because of their race, this case

presents an ordinary, if all too familiar, prayer for relief under Title VII. They have charged that the defendant CCP "granted preferential treatment" to black applicants, resulting in defendant's refusal to hire the plaintiffs. This case, therefore, fits squarely within the category of Title VII actions known as "disparate treatment" cases. The Supreme Court has defined disparate treatment as "the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race . . . ." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977).[2] The fact that plaintiffs do not belong to a racial minority is of no consequence. It is well established that Title VII prohibits racial discrimination against white persons "upon the same standards as would be applicable were they Negroes." *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 280, 96 S.Ct. 2574, 2579, 49 L.Ed.2d 493 (1976).

■ It is clear, therefore, that the same standards as to burden of proof apply in this case as would be applicable in other disparate treatment actions brought under Title VII. These standards have been explained concisely by the Supreme Court and the Court of Appeals for the Third Circuit:

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

Once the plaintiff establishes such a prima facie case, "[t]he burden must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the employer produces evidence which satisfies this burden, the individual plaintiff must then be presented with "a fair opportunity to show that [the employer's] stated reason for [the individual plaintiff's] rejection was in fact pretext."

*Scott v. University of Delaware*, 601 F.2d 76, 80 (3d Cir.), cert. denied, —— U.S. ——, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979), quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (footnote omitted). Most significantly, it is now well-established that the plaintiff in a disparate treatment action such as this one must show that there was a *discriminatory motive* for defendant's actions. *International Brotherhood of Teamsters*, supra, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15; *Scott*, supra, 601 F.2d at 80.

Before proceeding to a review of the evidence, it is also important to understand a complicating factor which is present in this case. We are concerned here with the decisions to hire certain persons and not to hire others for positions as full-time faculty members at an institution of higher education. This brings us into an area where the federal courts should tread lightly. As the Court of Appeals for the Second Circuit has stated, "[o]f all fields, which the federal courts should hesitate to invade and take over, education and faculty appointments at a University level are probably the least suited for federal court supervision." *Faro v. New York University*, 502 F.2d 1229, 1231–32 (2d Cir. 1974). Obviously, we are not dealing here with unskilled labor or with jobs requiring only manual or clerical skills. The qualifications necessary to teach at the college level are necessarily subjective, as well as objective, and thus the criteria by which an applicant for such a position is judged must include a subjective element. A number of other courts have expressed their reluctance to intrude in this

---

**2.** The courts distinguish "disparate treatment" actions from claims alleging "disparate impact." For a discussion of this distinction, see *International Brotherhood of Teamsters*, supra, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n.15.

area, noting that substantial deference must be accorded to the judgment of experts in the various academic disciplines. See, e. g., *Megill v. Board of Regents of the State of Florida*, 541 F.2d 1073, 1077 (5th Cir. 1976); *Stebbins v. Weaver*, 537 F.2d 939, 943 n. 2 (7th Cir. 1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Johnson v. University of Pittsburgh*, 435 F.Supp. 1328, 1353–54 (W.D.Pa. 1977); *United States v. Wattsburg Area School District*, 429 F.Supp. 1370, 1377–78 (W.D.Pa.1977); *Green v. Board of Regents of Texas Tech University*, 335 F.Supp. 249, 251 (N.D.Tex.1971), aff'd, 474 F.2d 594 (5th Cir. 1973); *Labat v. Board of Higher Education of the City of New York*, 401 F.Supp. 753 (S.D.N.Y.1975). This does not mean, of course, that colleges and universities are free to engage in racial discrimination under the guise of academic expertise. On the contrary, the federal courts have a duty to intervene where the will of Congress is being violated, even when the defendant is an institution of higher education. See *Powell v. Syracuse University*, 580 F.2d 1150, 1153 (2d Cir.), cert. denied, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). Nevertheless, I am mindful that my task here is to evaluate the evidence according to the burden of proof standards discussed above. This task does not require me to substitute my judgment for those of the officials at CCP as to who is best qualified to teach certain courses in music and art.

1. The Art Department—Madeline Cohen

As explained in the *McDonnell Douglas* and *Scott* cases, supra, the initial burden here rests on plaintiff, Madeline Cohen, to establish a prima facie case of racial discrimination. To do so, she must show (1) that she is a member of a racial minority; (2) that she applied and was qualified for a job for which CCP was seeking applicants; (3) that her application was rejected; and (4) that after her rejection, the position remained open and the employer continued to seek applicants from persons of her qualifications. *McDonnell Douglas*, supra, 93 S.Ct. at 1824. Of course, plaintiff does not

technically meet the first criterion since she is not and does not claim to be a member of a racial minority. If this defeated her claim, however, no plaintiff in a reverse discrimination action could ever establish a prima facie case under the *McDonnell Douglas* test. Surely, the Supreme Court did not intend such a result. On the contrary, the Court recognized that the facts of Title VII claims will vary widely, and that its four criteria should be applied in a flexible manner so as to meet the circumstances of particular cases. *McDonnell Douglas*, supra, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. Indeed, the Court has since held that *McDonnell Douglas* is important, not for creating a four-part mechanical formula, but for recognizing "the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *International Brotherhood of Teamsters v. United States*, supra, 431 U.S. at 358, 97 S.Ct. at 1866. See also *Meyer v. Missouri State Highway Commission*, 567 F.2d 804, 808 (8th Cir. 1977), cert. denied, 435 U.S. 1013, 98 S.Ct. 1888, 56 L.Ed.2d 395 (1978). Obviously, Ms. Cohen is a member of the racial class allegedly discriminated against, i. e., white persons. This is sufficient to satisfy the first *McDonnell Douglas* criterion in the circumstances of the present case. See *Calcote v. Texas Educational Foundation*, 578 F.2d 95 (5th Cir. 1978).

■. The second criterion is more troublesome. Here, plaintiff must show that she applied for *and was qualified for* a job for which CCP was seeking applicants. There is evidence in this record which raises serious doubt as to whether Madeline Cohen was actually qualified to suit CCP's needs at the time.

The job Ms. Cohen sought was a full-time position available in the art department for the 1974–75 academic year. The art hiring committee had drafted a set of necessary qualifications (Exhibit 11) and had published an advertisement seeking applicants for the position (Exhibit 10). These documents

show that the committee was interested in someone who could teach a survey in western art and who was also competent to teach a course in non-western art. According to Exhibit 11, the non-western areas that the committee had in mind included "African, Afro-American, Chinese, Indian, Islamic, Japanese, Pre-Columbian, etc." Exhibit 11, ¶ 4. Other evidence in the record, however, makes it clear that the primary interest of both the hiring committee and the college administration lay in the area of African and Afro-American art, rather than in any of the other non-western areas identified by Exhibit 11. The only areas specified by the committee in its advertisement were "[s]urvey of Western art/African & Afro-American." This notice was drafted by the hiring committee members and it was the only public announcement of the available position. N.T. 3–80. At the relevant time, 1974, CCP had a high proportion of black students who were interested in taking African art courses. N.T. 2–78. At least in that particular year, therefore, the emphasis of the hiring committee was on one who could teach African and Afro-American art, rather than Chinese, Islamic, Japanese, etc. N.T. 2–92, 93. These views were clearly shared by the administration. Clayton White, the music and art department head, had discussed ways of strengthening the art history program with the art hiring committee. Mr. White suggested offering courses in African and Afro-American art because the music department had already done that, and they had been very successful. N.T. 7–144, 145. The committee agreed with this suggestion. N.T. 7–145. William Baker, director of the Division of Humanities and Applied Arts, of which the music and art department is a part, testified that CCP's preference in 1974 was definitely for someone with expertise in African and Afro-American art. N.T. 10–23. He explained that in 1968, the humanities division had introduced a course in Afro-American folklore and Afro-American literature. In 1970, the history department initiated a course in African and Afro-American history. Like the Afro-American music

course, "[t]hese courses had a very definite appeal to our students." N.T. 10–24. As to the other non-western fields noted in Exhibit 11, Mr. Baker indicated that CCP had no interest or needs in any of these areas. Some of these courses, in fact, would only be designed for third and fourth year students, thus making them wholly inappropriate for CCP's two year curriculum. N.T. 10–23. Mr. Baker testified that as a consequence, there had been "no serious consideration of course development in these areas," and that he would have to be consulted by the faculty before any such serious consideration could take place. N.T. 10–23.

It is clear to me, therefore, that in 1974 CCP needed a person with the specific ability to teach a course in African and Afro-American art. There is serious reason to believe that Madeline Cohen did not have these qualifications. Ms. Cohen did her undergraduate work at Brooklyn College where she had a combined major in mathematics and the history of art. While there, she took courses in renaissance art and architecture, baroque, and modern art. Her concentration was in "the latter half of the spectrum." N.T. 2–4. Thereafter, she attended the University of Pennsylvania (Penn) where she received a master's degree with a concentration in modern painting. She wrote her master's thesis "on an artist named Wasily Kandinsky, an abstract painter of the twentieth century. N.T. 2–4, 5. Subsequently, Ms. Cohen returned to Penn for her doctorate. At the time of trial, she had completed her doctoral exams and was in the process of preparing her doctoral dissertation, the subject of which was architectural urban history in America. N.T. 2–4, 5.

While these educational credentials were certainly impressive, they did not include a single course in African art or Afro-American art. N.T. 2–41-2–44. In fact, such courses were not even offered at Penn, where Ms. Cohen had done all her postgraduate work. N.T. 8–7. Even one of the supporters of her candidacy on the hiring committee conceded that without this course-work, she did not satisfy all the cri-

teria. N.T. 2–94. Moreover, Ms. Cohen never even made the claim that she was prepared to teach Afro-American art courses until after she learned that Clayton White had recommended another candidate for the position. Exhibits 26, 12; N.T. 2–40, 41.

Ms. Cohen claimed that her training in Islamic art qualified her to teach the African and Afro-American courses. There was good reason, however, for the hiring officials at CCP to disagree with this claim. They received expert advice counseling them that African art and Islamic art are two entirely different fields. N.T. 8–9, 8–18. This same expert evidence was offered at trial without credible contradiction. N.T. 9–20 to 9–22. Indeed, in the expert's view, a person with Ms. Cohen's academic training would not be qualified to teach either African or Afro-American art. N.T. 9–23.

The fact that the hiring committee had recommended Ms. Cohen as its first choice of course was very much in her favor. Nevertheless, the committee's judgment was subject to question. One of the two committee members conceded that Ms. Cohen would have to teach the African/Afro-American field to herself before she could present any courses to students. N.T. 2–101. Apparently, the committee was of the view that this deficiency was not a serious problem, since "I think a good art historian should be able to organize, research the course and then teach it." N.T. 2–96. This, however, is far more easily said than done. Unlike western art, African art is a very difficult field in which to pursue a process of self-instruction because there is a lack of any text prepared by artists or art historians. Rather, the available materials on the subject emanate from the field of anthropology, where primary interest is placed on the use of an object rather than on its artistic value. N.T. 9–24, 25.

This evidence shows, therefore, that it was entirely reasonable for White and Baker to consider Madeline Cohen unqualified in light of CCP's needs. Indeed, I conclude that Ms. Cohen has failed to carry her burden of proving that she was qualified for the position she sought.

This holding alone is enough to defeat Ms. Cohen's claim for relief under Title VII since she has failed to establish a prima facie case. Even if I were to conclude, however, that plaintiff had proven herself qualified for the position at CCP, she would still not succeed in this litigation. Yet to be considered are the third and fourth parts of the *McDonnell Douglas* test.

Plainly, Ms. Cohen satisfied the third criterion since she was most definitely rejected in her bid for a full-time position on the art faculty.

A very different result is reached, however, with regard to the fourth criterion. Here, the Supreme Court requires the plaintiff to show that, following her rejection, the position she sought remained open and the defendant continued to seek applicants from persons of plaintiff's credentials. Once again, it must be noted that these criteria are to be applied flexibly so as to accommodate the variations in Title VII claims. Thus, like the first requirement, the fourth must also be adapted to suit the facts of this case.

Ms. Cohen does not complain that the job remained open to persons of her qualifications after her rejection. Rather, she alleges that a less-qualified applicant was granted preferential treatment and awarded the job simply because that person was black. This charge, if proven, would satisfy the fourth *McDonnell Douglas* criterion. See *Johnson v. University of Pittsburgh, supra,* 435 F.Supp. at 1360. I find, however, that the record does not support Ms. Cohen's claim.

The candidate actually hired was Jacqueline Brown, a black woman. It is clear to me that she was fully qualified for the job. Ms. Brown had a B.A. from Spelman College and an M.A. from Howard University. Unlike plaintiff Cohen, Brown had an extensive background in African and Afro-American art. Plaintiff does not challenge Ms. Brown's credentials in the African area. On the contrary, plaintiff's brief refers to Brown as "a specialist in the area of Afri-

can art." Plaintiff's Memorandum of Law, at 8. This description is quite accurate. Ms. Brown's master's degree was in art history with a concentration in African art, and she also had some employment experience in this area. See Finding of Fact No. 38. Perhaps most significantly, Ms. Brown came to her hiring committee interview armed with a syllabus for a proposed Afro-American course. She thus graphically demonstrated her readiness and ability to fulfill CCP's needs in this area.

Cohen's argument is that Brown failed to satisfy the other half of the hiring committee's criteria, i. e., ability to teach the basic survey course in western art. I cannot agree with this contention. Both members of the hiring committee had endorsed Brown as fully qualified, and there was no change in this recommendation at trial. Exhibit 13. See also N.T. 2–100. I realize, of course, that both members of the committee also endorsed Madeline Cohen as fully qualified, and they ranked her above Ms. Brown. As discussed above, however, there are very serious reasons to question this recommendation, not the least of which were the failure to distinguish properly between African and Islamic art, and the committee's misplaced reliance on Cohen's alleged ability to teach herself the African art field.

By contrast, the record discloses no reason to doubt the committee's judgment that Brown could teach the basic survey course in western art. The only flaw in her credentials was the fact that her undergraduate grades were disappointing. In compensation for this factor, however, the committee noted that "her grades for the four completed graduate courses reflect a high level of accomplishment." Exhibit 13. Moreover, Clayton White had interviewed Ms. Brown independently, and he came away satisfied that she could teach the survey course. N.T. 8–12.

■■ I therefore reject plaintiff's suggestion that Ms. Brown was less qualified. On the contrary, I find that Jacqueline Brown was the more qualified of the two candidates for the specific position then available in CCP's art department. I therefore conclude that plaintiff Madeline Cohen has failed to establish a prima facie case of racial discrimination.[3]

2. The Music Department—Monica Sokolsky and Jan Coward

Like Madeline Cohen, plaintiffs Sokolsky and Coward must carry the initial burden of establishing a prima facie case under the *McDonnell Douglas* criteria. For the reasons that follow, I hold that they have failed to do so.

Of course, Coward and Sokolsky satisfy the first requirement, membership in a racial minority, for the same reasons that Madeline Cohen satisfied it. Similarly, they meet the third criterion since they too were rejected by CCP.

I find that Coward and Sokolsky also meet the second criterion. Here, they must show that they were qualified for the jobs they sought. In light of their background and training, as well as CCP's needs, there is little doubt that these plaintiffs were in fact qualified. Indeed, CCP makes no claim to the contrary.

In 1974, the college was planning an expanded music curriculum, to commence the

3. Even if I were to find that Ms. Cohen had succeeded in establishing a prima facie case, her task would be far from over. It would then be up to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, supra, 411 U.S. at 802, 93 S.Ct. at 1824. In my view, CCP could easily satisfy this burden by demonstrating that it needed a teacher specially skilled in the African/Afro-American field, and that Ms. Brown's credentials here were plainly superior to Ms. Cohen's. Plaintiff would then be required to show that this reason was in fact a "pretext." Id. As explained above, Clayton White and William Baker went to considerable lengths in examining Cohen's African credentials. This even included consultation with an expert, making it unlikely at best that their claimed interest in the African field was a mere pretext. Perhaps even more importantly, the college has since done precisely what it has said that it planned to do in 1974. The curriculum has been expanded significantly in the African/Afro-American area with courses taught primarily by Jacqueline Brown. N.T. 2–92, 2–104, 105, 2–108, 109.

following fall. This created immediate needs for instructors who could teach music history, music theory, black music or ethnomusicology, and piano performance. N.T. 8–27, 28; 5–89; 6–3, 4; 3–112, 113. Coward had a B.M. from East Carolina University and an M.M. from the University of North Carolina. His bachelor's degree was in theory and his master's was in performance. At the time of trial, he had completed 30 credits toward his doctorate in musicology. N.T. 6–43; Finding of Fact No. 18. Sokolsky had a B.F.A. from Carnegie-Mellon University and an M.M. from Temple University. Her master's degree was in theory, and her undergraduate major was in piano performance. N.T. 2–119; Finding of Fact No. 19.

Both Sokolsky and Coward had been employed at CCP in part-time and guest lectureship capacities for several years. By both academic credentials and teaching experience, Sokolsky would have satisfied needs in theory, as well as piano, and Coward would have filled needs in history. N.T. 5–73; 5–87, 88; 4–73; 5–17. In some instances, there were doubts expressed about both plaintiffs, particularly Jan Coward. N.T. 6–17, 18; 6–21; 10–47. These comments were not significant, however, and I am persuaded that both Sokolsky and Coward were qualified for the jobs they sought. As noted above, CCP does not dispute this conclusion.

■ The problem with the plaintiffs' case arises when we reach the fourth *McDonnell Douglas* criterion. Once again, the complaint here does not track the language of the Supreme Court's formula. Rather, Sokolsky and Coward argue that three less-qualified black persons were given preferential treatment and hired by CCP because of their race. As with Madeline Cohen, proof of this claim would satisfy the fourth requirement. I find, however, that the three persons actually hired in 1974 were not in any way "less-qualified," nor was the treatment they were accorded preferential.

The first hired in 1974 was Joy Simpson. She had received her bachelor's degree from Temple University, where she majored in piano and voice education. She had then earned a master's degree at the Juilliard School, majoring in voice. In addition, she had attended the Academy of Vocal Artists in Philadelphia for five years, and had studied for a summer at the Afro-American Teacher Training Institute, Lincoln University. Prior to her hiring for the music department position, she had worked as an assistant director of CCP's choir.

Ms. Simpson's educational background qualified her to teach both voice and theory. It may well be, of course, that plaintiff Sokolsky was more qualified to teach theory. This, however, must be counterbalanced against Ms. Simpson's unique qualifications as an opera singer. By all account, she was a truly exceptional performer, and even more importantly, she had developed a professional reputation worthy of her talents. N.T. 5–11, 5–87. Her accomplishments included winning both the Metropolitan Opera competition and the Naumburg Prize, "our country's highest music prize." N.T. 9–8. In addition, she had performed at President Carter's inaugural concert series, and was doing television work. N.T. 9–8. As one member of the hiring committee, who supported both Coward and Sokolsky, put it: "Joy Simpson would have been a great asset to us . . . We would have stood to benefit a great deal from her presence." N.T. 5–87.

It is clear to me, therefore, that Joy Simpson was more than merely qualified for the position. She also would bring to CCP uniquely valuable qualities which Jan Coward and Monica Sokolsky neither had nor claimed to have.

It should also be noted that both Ms. Sokolsky and Mr. Coward joined with the other members of the music hiring committee in unanimously recommending that Joy Simpson be offered a position at CCP. Exhibit 28. In light of this fact, it is difficult to understand how the plaintiffs can now argue that the decision to hire Ms. Simpson was motivated by racial discrimination.[4]

4. It might be suggested that plaintiffs' recommendation of Ms. Simpson in Exhibit 28 was

somehow tainted by the alleged "ringer" plot discussed in note 6, infra. For the reasons

The other two people hired were George Starks and Horatio Miller. George Starks had a B.A. in music education from North Carolina A & T University, an M.S. in music education from the University of Illinois, and a Ph.D. in Afro-American music from Wesleyan University. He had taught at the college level since 1965 and his experience included a position as ethnomusicologist in residence at Howard University. N.T. 8–41. Notably, he was the only one of all five candidates who had obtained a doctoral degree. Dr. Starks' credentials made him eminently qualified to fill CCP's needs in the field of black music. Furthermore, he was fully competent to teach music history. N.T. 5–11; 5–26, 27; 5–85, 86.

Horatio Miller had a B.A. from the University of Pennsylvania in musicology, which includes theory and history. He also had an M.A. in piano performance from Temple University. N.T. 8–45, 46. Miller thus filled a need in piano, as well as in history. Moreover, although he lacked the credentials of Dr. Starks, he was capable of teaching black music. The hiring committee was aware that Starks could not be expected to teach all the classes in black music because of the scheduling burdens this would place on him. Miller, therefore, specifically filled the need for someone who could assist Starts with the black music load. N.T. 5–96. By contrast, neither Monica Sokolsky nor Jan Coward could have filled this need. N.T. 5–87; 5–97.

Miller's greatest talent, however, lay in the area of piano performance. He was considered an outstanding pianist, and at the time he was hired, he had recently been invited by the Soviet Union to participate in the Tchiakovsky International Music Competition. This was regarded as a most noteworthy achievement. Indeed, it was well-known in the music field that even the worst performers in such a competition were among the "cream." N.T. 5–94.

It is abundantly clear, therefore, that Simpson, Starks, and Miller were all thoroughly qualified, as well as highly talented individuals. At the very least, they were as well qualified for the positions into which they were hired as were plaintiffs Sokolsky and Coward.

It may be that one or more of these hiring decisions were ill-advised. The evidence indicated, for example, that Joy Simpson proved to be a better professional performer than she was a teacher. She terminated her employment with CCP after only one year. N.T. 4–76, 77; 9–10 to 9–14.[5] The luxury of hindsight, however, was not available to the CCP administration in 1974. It is clear from this record that the decisions to hire Simpson, Starks, and Miller rather than Sokolsky and Coward were made in good faith, reasonably calculated to fill the legitimate academic needs of the institution at the time. See *Johnson v. University of Pittsburgh*, supra, 435 F.Supp. at 1357. The evidence does not support the inference that these hiring decisions were motivated by an invidious racial discrimination or that the persons hired were accorded preferential treatment. I hold, therefore, that like Madeline Cohen, plaintiffs Sokolsky and Coward have failed to establish a prima facie case.[6]

---

expressed in Findings of Fact 52–62, I reject any such suggestion.

**5.** It should be noted that CCP's experience with Starks and Miller was not the same as with Simpson. At the time of trial, Miller was still teaching at CCP having recently been promoted to the rank of assistant professor. N.T. 7–57, 58. The evidence is conflicting as to how long Dr. Starks remained on CCP's faculty. N.T. 4–76; 8–43. In any event, it appears that he left CCP to take a position at the University of Virginia to begin a graduate program there in ethnomusicology. N.T. 8–43. The record contains no evidence at all that either Starks or

Miller failed to fill the needs for which they were hired.

**6.** Plaintiffs have placed considerable emphasis on the plot, allegedly hatched and promulgated by Clayton White, to submit a "ringer" candidate for a position in the music department. They argue that "[t]his plot illustrates the mind of Clayton White," and it supposedly proves the existence of discrimination because "[s]uch a plot would be unnecessary if whites could get a fair shake in the hiring process." Plaintiffs' Memorandum of Law, at 9.

For the reasons expressed in my Findings of Fact, however, I conclude that this scheme

This does not conclude the case as far as Sokolsky and Coward are concerned, however. Rather, we must also consider the question of retaliation.

After being denied full-time positions at CCP in the fall of 1974, Sokolsky and Coward filed complaints alleging racial discrimination with the EEOC. Meanwhile, they stayed on at CCP in part-time capacities. The EEOC processed the grievances and ultimately sent plaintiffs notices of right to sue. On July 28, 1975, having received these notices, the plaintiffs filed the complaints that launched this litigation. Less than one month later, on August 20, 1975, the music hearing committee met. The committee included Clayton White, Brian Kovach, Leon Silvan, George Starks, and Horatio Miller.[7] Copies of the July 28 complaint were made available to the committee members at this meeting. These copies had been procured with the assistance of William Baker, director of the division of Humanities and Applied Arts. N.T. 7–72. The complaint contained the specific allegation that Simpson, Starks, and Miller were less qualified for the positions in the music department than were Sokolsky and Coward, and that these three persons had been hired because they were black.

White, Starks, and Miller were upset and insulted by this language. N.T. 4–81 to 4–84; 6–29, 30; 7–91 to 7–94. Clayton White remarked that people would make such charges were not fit to teach at CCP. N.T. 6–30. Horatio Miller reacted at the meeting with anger, and he later called the charges "abusive" and "insulting." N.T. 7–72, 73.

Sokolsky and Coward received the two highest ratings of 28 available candidates for any openings in the music department during the 1975–76 academic year. Exhibit 41; N.T. 4–84. Furthermore, Sokolsky and Coward had already been teaching at CCP in part-time and guest lectureship capaci-

ties for some four years. Nevertheless, at the August 20, 1975, meeting, the music hiring committee voted not to recommend Sokolsky and Coward for even part-time employment. Subsequently, the person who had been ranked third was hired for a full-time position, and the fourth and fifth ranked candidates were hired in visiting lectureship capacities. N.T. 4–85; Exhibit 41. Sokolsky and Coward were offered no positions.

I am fully persuaded that the decision not to offer employment of any kind to plaintiffs Sokolsky and Coward was made in retaliation for the charges raised by the plaintiffs in the complaint filed on July 28, 1975. The facts described above simply do not permit any other conclusion.

This conclusion is buttressed by the testimony of three people who attended the August 20 meeting. Brian Kovach, who voted in favor of rehiring Sokolsky and Coward, testified as follows:

Q. Well, you said they were upset by the lawsuit.

A. By the lawsuit, yes.

Q. And because of their being upset they took some action.

A. Exactly.

Q. And the action was what?

A. That no part-time positions were to be given to these two candidates until the lawsuit was settled.

N.T. 4–83.

Leon Silvan, who also voted in favor of rehiring the plaintiffs, gave this testimony:

At the meeting Clayton [White] expressed a very profound amount of insult that these two people would bring suit against the college and furthermore name him in the suit, and he felt that anyone who would do that should not be permitted to teach part-time or full-time.

amounted to nothing more than an unfortunate incident which has no significance to this case at all. There is no evidence connecting anyone in an actual hiring capacity to the plot, nor is there anything to show that it had even the slightest impact on any hiring decision. On

this record, the defendant CCP cannot be held responsible for the existence of this plan. See Findings of Fact Nos. 52–61 and 48–51.

7. By this time, Joy Simpson had left the CCP faculty. See text accompanying note 5, supra.

He felt that this was an affront to his, shall we say, professional demeanor.

N.T. 5–108, 109.

Most convincing of all, however, is the testimony of Horatio Miller, who along with White and Starks, voted against rehiring Sokolsky and Coward. Mr. Miller testified as follows:

> We thought that—well, when I say we I mean Clayton and George Starks and myself felt that because this was a racist document to which these people had signed their names, they had made insulting and villainous accusations against their colleagues, we did not think it to be appropriate to recommend them for part-time work.

N.T. 7–73.

Finally, the clear inference of retaliation that rings forth from the above testimony and evidence is fully confirmed by paragraph III of the minutes from the August 20, 1975, meeting, as well as by paragraph IV of the amended minutes. Both paragraphs read as follows:

> Discussed suit filed by Monica Sokolsky and Jan Coward against college. Decided to let college and court settle matter. Committee decided not to invite Mr. Coward and Ms. Sokolsky to teach at CCP until suit is resolved.

Exhibits 42 and 43.

I find that the decision not to offer Sokolsky and Coward employment was motivated by retaliation for their actions in bringing this lawsuit. The question is whether the law offers them any relief. I hold that it does.

Plaintiffs rely on 42 U.S.C. § 1985(2) and on Title VII, 42 U.S.C. § 2000e–3. Section 1985 is of no use to plaintiffs here. In *Great American Federal Savings and Loan Association v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), the Supreme Court held that the deprivation of a right created by Title VII cannot be the basis for a cause of action under section 1985(3). Here, plaintiffs complain that they were retaliated against for filing a complaint which sought to enforce Title VII employment rights. The right not to be retaliated against for filing such a complaint is clearly a right "created by Title VII." This is recognized by Title VII itself, and that statute specifically protects persons against such retaliation. 42 U.S.C. § 2000e–3.

The Supreme Court gave no indication that it meant to limit the *Novotny* decision to section 1985(3). Rather, I hold that *Novotny* applies to all three subdivisions of section 1985, and is thus a bar to this cause of action under that statute.

This holding, however, should not trouble the plaintiffs. As noted above, Title VII itself provides them the protection they seek. 42 U.S.C. § 2000e–3(a) specifically prohibits retaliatory discrimination against an employee or employment applicant because such a person has "opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

I hold that the remedial provisions of section 2000e–3(a) are easily broad enough to afford relief in the circumstances present here. In this case, plaintiffs had filed charges with the EEOC and then filed their complaints in this court after receiving the necessary notices from the commission. Strictly speaking, the retaliation complained of came in response to the district court complaint and the charges it contained, rather than to the charges filed with the EEOC. Technically, therefore, plaintiffs were not retaliated against for participating "in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Rather, the EEOC had terminated its investigation and proceedings by sending plaintiffs a notice of right to sue.

Nevertheless, the statute also prohibits an employer from retaliating against an employee or applicant "because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). By filing their complaint in this court, plaintiffs were opposing racial discrimination in employment, a prac-

tice most definitely "made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a).

In addition, it is clear that by filing their complaint in this court, plaintiffs were engaged in the process of enforcing their rights under Title VII. Moreover, they were doing so according to the orderly procedures established by Congress and the Commission. I hold that retaliation against them for such an act is prohibited by § 2000e–3(a). See *Hicks v. ABT Associates, Inc.*, 572 F.2d 960, 969 (3d Cir. 1978); *Hochstadt v. Worcester Foundation For Experimental Biology*, 425 F.Supp. 318, 324 (D.Mass.), aff'd, 545 F.2d 222 (1st Cir. 1976).

The fact that I have decided plaintiffs' underlying charge of racial discrimination in defendant's favor is of no consequence to the retaliation claim. It is well established that even when a charge of discrimination is without merit, an employee or applicant is still protected by Title VII in making the charge, and he may not be retaliated against. *Hicks v. ABT Associates, Inc.*, supra, 572 F.2d at 969; *United States v. University of Maryland*, 438 F.Supp. 742, 758 (D.Md.1977); *Bradington v. International Business Machines Corp.*, 360 F.Supp. 845 (D.Md.1973), aff'd, 492 F.2d 1240 (4th Cir. 1974).

▮ Defendant CCP argues, however, that even if section 2000e–3(a) does cover the facts of this case, plaintiffs cannot obtain relief under Title VII because they have failed to exhaust their administrative remedies. There is no dispute about the fact that Sokolsky and Coward never filed complaints with the EEOC regarding their charge of retaliation. Stipulation of Facts, ¶ 34. CCP argues that plaintiffs' failure to bring their retaliation claim to the Commission bars them from seeking relief on that claim in this court. I do not agree.

In dealing with virtually the same issue as that now before me, my learned colleague Judge Luongo reasoned that this court may exercise jurisdiction over all claims which were included in the EEOC charge "and like or related matters which might reasonably be expected to be subject to an EEOC investigation growing out of the charge." *Flesch v. Eastern Pennsylvania Psychiatric Institute*, 434 F.Supp. 963, 970 (E.D.Pa.1977). He went on to hold that "[t]his rule is broad enough to include claims arising from new acts occurring during pendency of the EEOC charge and reasonably related to or growing out of acts alleged in the charge. Claims of retaliation for filing the charge are within this category." *Id.* (citation omitted). Obviously, there is considerable wisdom in Judge Luongo's reasoning. To require a return to the Commission by the complaining employee or applicant with each new act of discrimination would hopelessly complicate the procedure and run counter to the remedial purposes of the statutory scheme. See *Shehadeh v. Chesapeake and Potomac Telephone Company of Maryland*, 193 U.S.App. D.C. 326, 332 n. 20, 595 F.2d 711, 717 n. 20 (D.C.Cir. 1978); *Weise v. Syracuse University*, 522 F.2d 397, 412 (2d Cir. 1975).

Quite recently, the Court of Appeals for the Third Circuit made clear its belief that "broad remedial legislation such as Title VII is entitled to the benefit of liberal construction." The court went on to state that "humanitarian legislation" should be interpreted "in a humane and commonsensical manner." *Hart v. J. T. Baker Chemical Corp.*, 598 F.2d 829, 831 (3d Cir. 1979). I believe that Judge Luongo's holding in *Flesch* is entirely consistent with the policy enunciated by the Court of Appeals in *Hart*. I will therefore follow *Flesch* and hold that plaintiffs are not barred from obtaining relief in this court under Title VII for defendant's retaliatory actions. See generally, B. Schlei and P. Grossman, Employment Discrimination Law 995 (1976).

By agreement of counsel, the trial of this case was limited to the question of liability, and no evidence was heard regarding damages. A hearing will therefore be held at the earliest opportunity to assess the damages suffered by plaintiffs Sokolsky and

Coward as a result of defendant's retaliatory actions against them.[8]

## B. The Affirmative Action Plan

In addition to setting forth their individual cases, claiming racial discrimination under Title VII, the three plaintiffs have also challenged the propriety of CCP's affirmative action plan. They argue that this plan establishes an illegal racial quota system, according undue preference to minority employment applicants.

A strong argument could be made, of course, that this aspect of plaintiffs' case is now moot in light of my holding that plaintiffs were not discriminated against and that the persons actually hired were not given preferential treatment. Nevertheless, it is clear that CCP did in fact maintain an affirmative action plan for faculty hiring at all times relevant to this suit. Stipulation of Facts, ¶ 14. If, as the plaintiffs allege, the plan was illegal, and if it had an impact on the hiring decisions involved in this case, then the plaintiffs might be entitled to some form of relief. The scope of that relief would depend on the nature of the plan's illegality as well as the extent of its impact on the plaintiffs.

Relief, however, is a question that I shall not reach. For the reasons that follow, I conclude that CCP's affirmative action plan did not violate Title VII.

The first step in this analysis is to determine exactly what the affirmative action plan was. In a memorandum dated June 2, 1972, CCP's president, Dr. Allen T. Bonnell, set forth the essentials of the affirmative action program that the college would follow throughout all times relevant to this suit. See Exhibit 2. This memo began by reaffirming the policy "that every possible effort shall be exerted to enroll students and recruit faculty and staff who are appropriately representative of the constituencies we serve." Exhibit 2. The memo went on to point out that CCP had enjoyed less success in recruiting minority faculty members than in attracting minority students. As a result, the president stated that all "committees, offices, and officers" who were responsible for recommending new personnel would henceforth attach to their recommendations:

   a. Evidence that there is a deliberate, consistent practice of seeking as candidates for consideration for potential openings representatives of minority groups in the community; and

   b. Information regarding the methods used to identify candidates from minority groups and specifics regarding the candidates identified, whether recommended for appointment or not.

Exhibit 2. To enforce the policy, the president would sign no new employment contracts without evidence that the recommending officer or committee had complied with (a) and (b) above.[9]

The defendant maintains that this memorandum is a complete and accurate statement of its affirmative action policy. Plaintiffs, however, have offered evidence by which they seek to show that in reality, the college was pursuing a different policy of affirmative action than that described in the Bonnell memorandum. Exhibit 6 is a newsletter describing the substance of a meeting on January 16, 1974, between President Bonnell and the executives of the Faculty Federation, the union which represented the faculty members at CCP. The newsletter was prepared by Henry C. Swezey, an assistant professor of history and a "co-coordinator" of the Faculty Federation. The newsletter reports the following:

President Bonnell stated that he thought that this college probably has one of the shortest and simplest policy statements of Affirmative Action: that the President of the College will not sign a contract for any individual recommended by a department unless the individual is a minority candidate or unless the department can demonstrate that it has thoroughly

---

8. Plaintiff Madeline Cohen has not raised any claim of retaliation.

9. President Bonnell's memorandum, Exhibit 2, is reproduced in its entirety at Finding of Fact No. 74.

searched and has not been able to find a qualified minority candidate.

Plaintiffs argue that this in fact was the actual affirmative action policy of CCP, rather than the one described in Exhibit 2. Although Exhibit 6 does not purport to be a verbatim transcription of Dr. Bonnell's words, plaintiffs point out that the newsletter's version is corroborated by Exhibit 8. This exhibit is another newsletter, dated February 25, 1974, and prepared by one Karen Schermerhorn, who, like Henry Swezey, attended the January 16 meeting. Ms. Schermerhorn's newsletter reports that in summarizing CCP's affirmative action policy, "Bonnell said he would not sign any new faculty contracts unless those involved can say that they could not find suitable minority group candidates." Exhibit 8, page 4.

Finally, Exhibit 9 must also be considered. This exhibit is the minutes of another meeting between Dr. Bonnell and the Faculty Federation officials. This meeting took place on May 8, 1974. The minutes state that the following occurred during a discussion of affirmative action at CCP: "Bonnell gave as an example that, unless a white department recommended a black candidate, or unless an all-male department recommended a woman candidate, the College would not appoint any other candidate." Exhibit 9, page 2.

If, as plaintiffs suggest, Exhibits 6, 8 and 9 accurately reflect the affirmative action hiring policy in effect at CCP, I would most certainly hold that the policy is illegal. The remarks attributed to Dr. Bonnell in these three exhibits evince a policy that subscribes to an unyielding 100 per cent preference for minority persons. Such a policy, as unreasoned as it is absolute, would plainly be an invidious racial discrimination. In my opinion, the plan characterized in Exhibits 6, 8, and 9 would extend far beyond the permissible limits of affirmative action and would be a fitting target for the injunctive powers of this court. For several reasons, however, I find that Exhibits 6, 8, and 9 are unreliable as evidence in this case. Indeed, I hold that these exhibits have lit-

tle, if any, probative value in determining what may have been the affirmative action policy of defendant CCP at any time relevant to this suit.

I choose to discount the reliability of these exhibits because of the testimony given by three witnesses: Dr. Bonnell, Frank Skahill, and Henry Swezey.

Not surprisingly, Dr. Bonnell takes issue with each of the statements attributed to him. First, he testified that Exhibit 6 inaccurately paraphrased his words. While he certainly agreed that he discussed affirmative action at the January 16, 1974, meeting, he claimed that he did not use the words reported in Exhibit 6. Rather, Dr. Bonnell insists that at the January 16 meeting, he simply referred to and read from his earlier memorandum on affirmative action, Exhibit 2. He also testified that he had no intention of announcing a change in college hiring policy on January 16, and that in any event he would have lacked the authority to make such a change because the policy had been established by the Board of Trustees. N.T. 4–14, 15.

Exhibit 8, of course, is merely another version of the remarks allegedly made by Dr. Bonnell at the same meeting. This version, too, he disputed, and he said the correct words were to be found in Exhibit 2. N.T. 4–55, 56.

Finally, Dr. Bonnell denied categorically having made the statement attributed to him in Exhibit 9. N.T. 4–16.

This testimony is completely supported by that of Frank J. Skahill, assistant to the president for personnel at CCP. Skahill testified that he was present at the January 16, 1974, meeting discussed above. N.T. 7–17. He confirmed that rather than making either of the statements attributed to him by Exhibits 6 and 8, Dr. Bonnell simply read from and referred to his earlier memo, Exhibit 2, when discussing affirmative action. N.T. 7–23 to 7–26. Specifically, he said that Dr. Bonnell "zeroed in" on subparagraphs (a) and (b), which are quoted above in their entirety. N.T. 7–23. He also testified that he attended the meeting on May 8, 1974, and he denied that Dr. Bonnell made

the statement expressed in Exhibit 9. N.T. 7–26.

I recognize that at the time of trial, Mr. Skahill was employed in an administrative capacity as an assistant to Dr. Bonnell. This factor, of course, must be considered in weighing the probative value of his testimony. Nevertheless, the testimony of both Bonnell and Skahill is fully supported by that of Henry Swezey.

Mr. Swezey attended both the January 16 and May 8 meetings as a representative of the Faculty Federation. He was also the author of Exhibit 6.

Swezey confirmed that Exhibit 6 was prepared from notes which he and Ms. Schermerhorn took. It does not purport to be a verbatim transcription. N.T. 1–9, 10. In his opinion, Exhibit 6 was accurate. On the other hand, he testified that Exhibit 8 was less accurate. It will be remembered that Exhibit 8 was prepared by Karen Schermerhorn, the same person whose notes were partially relied upon by Swezey in preparing Exhibit 6. The witness then went on to testify that at the January 16 meeting, Dr. Bonnell had indeed read from and relied upon his earlier memorandum, Exhibit 2. N.T. 1–27. He expressly remembered Dr. Bonnell having read aloud subparagraphs (a) and (b) of that document. N.T. 1–28. Most significantly, it was not Mr. Swezey's understanding that Dr. Bonnell was announcing a change in policy by his statements on January 16, 1974. On the contrary, he had the impression that Dr. Bonnell intended his statements to be consistent with Exhibit 2. N.T. 1–32.

As to Exhibit 9, Swezey expressed serious doubts about the accuracy of the statement which the exhibit attributes to Dr. Bonnell. Indeed, he testified that the CCP president "usually didn't word things that way." N.T. 1–17. Swezey, of course, was present at the meeting to which Exhibit 9 refers. It should also be noted that like Exhibit 8,

Exhibit 9 was prepared by Karen Schermerhorn.

This testimony leads to the inescapable conclusion that the statements recorded in Exhibits 6, 8, and 9, are practically worthless as evidence in this case. All three witnesses repudiated the accuracy of Exhibit 9. All three attended the meeting to which Exhibit 9 refers, and no one else who attended the meeting testified at the trial. I will therefore completely disregard the statement attributed to Dr. Bonnell by this exhibit.

The statement in Exhibit 8 is merely another version of the one in Exhibit 6. It too was repudiated by all three witnesses, and thus I cannot rely upon it.

The statement in Exhibit 6 was repudiated by two witnesses. The third witness was the author of the exhibit, and is thus useless as an independent source of verification. The accuracy of this statement, however, is entirely unimportant since all three witnesses have agreed that the foundation of Dr. Bonnell's remarks was Exhibit 2, and that no change was intended from the policy expressed in Exhibit 2.[10]

In my view, therefore, the evidence points to the memorandum issued by Dr. Bonnell on June 2, 1972, as the true source of the affirmative action policy maintained by CCP at all times relevant to this suit. My conclusion is supported by the statistical evidence regarding CCP's faculty. In December, 1972, the faculty consisted of 209 persons, of whom 18 were black. A year later, there were 20 blacks on a 205 person faculty. In the year in question, 1974–75, a total of 35 full-time faculty members were hired. Of these, 21 were white, 13 were black, and 1 was oriental. Findings of Fact Nos. 84 and 85. While these figures certainly indicate a vigorous affirmative action program, they are not consistent with the absolute minority preference illustrated by

10. At trial, plaintiffs' counsel suggested that if Exhibits 6, 8, and 9 were inaccurate, Dr. Bonnell and the CCP administration would have challenged them at the time they were issued. I refuse, however, to impose on defendant or its officers any duty to object, lest they acquiesce by their silence. More importantly, Bonnell and Skahill testified that they did not see these exhibits until preparing for this litigation. N.T. 4–14, 7–24. This is supported by Swezey's testimony. N.T. 1–18.

the statements in Exhibits 6, 8, and 9. Moreover, in the spring of 1974, Dr. Bonnell was asked by the college provost to prepare a "reinforcing statement on minority hiring." He replied to this request by reaffirming his reliance on Exhibit 2, and he attached a copy. For these reasons, I will focus my attention on Exhibit 2 in gauging the legality of CCP's affirmative action plan.

Plaintiffs have suggested that the college's affirmative action hiring plan is illegal because it establishes a racial quota system, even though CCP has no history of racial discrimination. Moreover, they argue that without demonstrating a history of such discrimination, CCP cannot utilize *any* plan that grants *any* kind of preference to a particular racial class, whether that plan employs an actual quota or not.

[11] I cannot agree with plaintiffs' position. To begin with, it is now clear that the use of quota systems in voluntarily adopted affirmative action hiring plans is not *per se* illegal. In *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the Supreme Court approved a plan whereby at least 50 per cent of all persons accepted into a craft training program were to be black until the percentage of black skilled craft workers at the plant in question approximated the percentage of blacks in the local labor force. Not only was this a racial quota, it was a one-for-one racial quota, thereby potentially disenfranchising a substantial number of white persons, including the plaintiff, Brian Weber. Mr. Weber relied on section 703 of Title VII, 42 U.S.C. § 2000e–2 which prohibits racial discrimination in hiring and in the selection of apprentices for training programs.

The Supreme Court began by defining the narrow scope of its inquiry. The question before the Court was only whether Title VII *permitted* a private employer and a union to adopt voluntarily an affirmative

action plan for the purpose of eliminating "traditional patterns of racial segregation." 443 U.S. at 201, 99 S.Ct. at 2726. *Weber* did not present the question of whether Title VII *required* such action. Moreover, the defendants were private parties not engaged in state action. *Weber* therefore raised no questions regarding the Equal Protection Clause and the Fourteenth Amendment.[11]

Proceeding to the merits, the Court examined the extensive legislative history of Title VII, and found that the statute could not fairly be read as prohibiting private employers from voluntarily adopting plans such as the one before it. Indeed, the legislative history made it clear that Congress intended Title VII to serve "as a spur or catalyst to cause 'employers and unions to self-examine and self-evaluate their employment practices and to endeavor to eliminate . . . the last vestiges of an unfortunate and ignominious page in this country's history.'" 443 U.S. at 204, 99 S.Ct. at 2728, quoting *Albemarle v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975).

For these reasons, the Court concluded that Title VII did permit employers to adopt voluntary affirmative action plans when their purpose was consistent with the Congressional intent underlying the statute. As to the details of particular plans, the Court found it unnecessary to define "the line of demarcation between permissible and impermissible affirmative action plans." Rather, the Court simply held that the plan before it "falls on the permissible side of the line." 99 S.Ct. at 2730.

The questions now before me are whether, under the principles of the *Weber* decision, the defendant CCP could legitimately adopt an affirmative action hiring plan, and if so, whether the plan actually adopted also "falls on the permissible side of the line." I find that both questions should be answered in the affirmative.

11. The defendant before me is a public college most definitely engaged in state action. See Findings of Fact Nos. 1–5. Nevertheless, the plaintiffs have not relied on 42 U.S.C. § 1983, the Fourteenth Amendment, or any provision of the Constitution. Rather, the complaint's challenge to the affirmative action plan is based solely on Title VII.

■ Plaintiffs argue that CCP could not permissibly adopt any affirmative action plan because the college has no history of racial discrimination. It is clear, however, that the Supreme Court in *Weber* was less concerned with past discrimination by the particular employer involved than it was with "traditional patterns of racial segregation." Indeed, it was because "blacks had long been excluded from craft unions" in general that very few had previously qualified for acceptance into the craft training program. 99 S.Ct. at 2725. See also id. n. 1. Therefore, I do not read *Weber* as requiring an employer to establish a history of actual discrimination on his own part before he is permitted to adopt an affirmative action plan designed to eliminate that discrimination. Rather, I hold that under *Weber*, an employer's affirmative action plan can be justified by the existence of a history of racial discrimination in the relevant occupation or profession at large. See Bernhardt, Voluntary Affirmative Action: Narrow Decision O.K.'s It, 65 A.B.A.J. 1321 (1979).[12] Plaintiffs have not even attempted to argue that employment in higher education has been traditionally free of racial discrimination, and indeed such an argument could not seriously be made. See Williams, Higher Education and Minority Opportunities, 21 How.L.J. 545, 551–52 (1978); Solomon and Heeter, Affirmative Action in Higher Education: Towards A Rationale For Preference, 52 Notre Dame Law. 41, 42–43 and n. 5 (1976). I note also that CCP's affirmative action plan was adopted expressly because the Board of Trustees was not satisfied with the College's success in attracting minority persons to its faculty. See Exhibit 2. I hold that under these circumstances, CCP could permissibly adopt an affirmative action plan for faculty hiring.

■ Finally, I must consider the details of the plan itself. Earlier, I explained that we must look to Dr. Bonnell's memorandum of June 2, 1972, Exhibit 2, for the accurate outline of the plan in use at all relevant times. When we examine this document, we find that the plan, in fact, is not very detailed at all. Contrary to plaintiffs' urgings, it most definitely does not establish a racial quota. It does not set any numerical goals or guidelines, and it makes no commitment to percentages. Rather, the plan simply requires that whenever a hiring recommendation is made, it must be accompanied by "evidence that there is a deliberate, consistent practice" of seeking minority candidates for potential openings, and information regarding the methods actually used in the particular case at hand to find and consider minority persons for that opening. Exhibit 2.

Clearly, this plan does not require the recommending officer to accept and recommend minority candidates whenever they can be found. What it does mean is that recommending officers and committees were required to submit proof of their efforts to inform, seek, and consider minority candidates along with white candidates before making a recommendation. See N.T. 4–10; 1–41. Plainly, such a plan is far less intrusive on the rights of white persons than the one-for-one quota approved by the Supreme Court in *Weber*.

Indeed, the CCP plan easily meets the *Weber* standard. Although, as mentioned earlier, the Court did not "define in detail the line of demarcation between permissible and impermissible affirmative action plans," 443 U.S. at 208, 99 S.Ct. at 2730, it did provide certain guidelines by which the plan before me can be judged. The Court noted that like Title VII itself, the plan was both "designed to break down old patterns of racial segregation and hierarchy," and "structured to 'open employment opportunities for Negroes in occupations which have been traditionally closed to them.'" *Weber*, supra, 443 U.S. at 208, 99 S.Ct. at

12. I am mindful of the statement in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), that "we have never approved preferential classifications in the absence of proven constitutional or statutory violations." 438 U.S. at 302, 98 S.Ct. at 2755. Nevertheless, I believe that considerably more guidance on this subject is to be found in the later *Weber* decision, and I choose to follow *Weber* as explained in the text above.

2730, quoting 110 Cong.Rec. 6548 (remarks of Sen. Humphrey). Similarly, as I have already noted, the CCP plan launches its affirmative assault on an occupation which has most certainly been traditionally closed to black persons.

Furthermore, the Court pointed out that "the plan does not unnecessarily trammel the interests of the white employees." 443 U.S. at 208, 99 S.Ct. at 2730. In particular, "[t]he plan does not require the discharge of white workers and their replacement with new black hires. . . . Nor does the plan create an absolute bar to the advancement of white employees; half of those trained in the program will be white." *Id.* As mentioned above, the CCP plan is even less intrusive on the rights of white persons. It neither requires the discharge nor bars the advancement of anyone.

Finally, the *Weber* court noted that the plan before it "is a temporary measure . . . . Preferential selection of craft trainees at the Gramercy plant will end as soon as the percentage of black skilled craft workers in the Gramercy plant approximates the percentage of blacks in the local labor force." *Id.* This is the one point on which the CCP plan departs from *Weber.* Exhibit 2 expresses no time limitation, and the affirmative action plan is intended to go on indefinitely. This would be far more disturbing if a specific quota had been adopted. In the absence of a numerical goal, a time limit may be unnecessary. Nevertheless, Exhibit 2 plainly does require hiring officials to take certain special steps that they would not have to take if the plan did not exist: viz., they must submit evidence that they sought and considered minorities each time they make a hiring recommendation.

The CCP plan would probably be more closely in line with *Weber* if it were designed to terminate at some point in the future. For example, the plan might be scheduled to end when the trustees become satisfied with the College's success in attracting minority faculty members. This deficiency, however, is not nearly so serious as to warrant intervention by the equitable powers of this court. In any event, such a change in the plan would not cure any injury demonstrated by the plaintiffs in this case.

For all the reasons expressed above, I conclude that defendant's affirmative action plan does not violate Title VII.

### III. CONCLUSIONS OF LAW

1. This court has jurisdiction over this case pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

2. To succeed in this action, plaintiffs bear the initial burden of establishing a prima facie case of racial discrimination.

3. Plaintiffs Madeline Cohen, Monica Skolsky, and Jan Coward have failed to carry their initial burden of establishing a prima facie case of racial discrimination.

4. Plaintiffs Monica Sokolsky and Jan Coward were illegally retaliated against for attempting to enforce their rights under Title VII in violation of 42 U.S.C. § 2000e–3(a).

5. The affirmative action plan for faculty hiring maintained by defendant CCP at all times relevant to this suit is permissible under Title VII.