**Dr. Leemon McHENRY, Plaintiff,**

v.

**Commonwealth of PENNSYLVANIA STATE SYSTEM OF HIGHER EDUCATION, Dr. David E. McFarland in his official capacity, Dr. Richard J. Collings, in his official capacity, Dr. Carl E. Brunner, in his official capacity Defendants.**

**No. Civ. 98–2468.**

United States District Court, E.D. Pennsylvania.

May 11, 1999.

Charles M. Watkins, Paul R. Ober & Associates, Reading, PA, for Plaintiff.

Claudia M. Tesoro, Office of Atty. Gen., Philadelphia, PA, for Defendants.

## MEMORANDUM AND ORDER

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

This reverse employment discrimination action is filed pursuant to the Civil Rights Act, Title VII, 42 U.S.C. § 2000e *et seq.* and under 42 U.S.C. §§ 1981, 1983, 1985(3). The Plaintiff in this case, Leemon McHenry, was employed in a one-year

teaching position for the 1995–96 academic year in the Philosophy Department at Kutztown University. The Plaintiff then applied and was denied a tenure-track position for the 1996–97 academic year. In denying him that position, Plaintiff argues that the Defendants, the Commonwealth of Pennsylvania State System of Higher Education, David E. McFarland, Richard J. Collings and Carl E. Brunner, discriminated against him because he is a white male.

Presently before the court are the following materials:

1. Motion and Memorandum of Law by Defendants for Summary Judgment filed on February 10, 1999.[1]

2. Exhibits in Support of Defendants' Motion for Summary Judgment filed on February 10, 1999.[2]

3. Stipulation Regarding Background Facts filed on February 10, 1999.[3]

4. Stipulation Regarding Additional Exhibit to Back Deposition filed on February 10, 1999.

5. Plaintiff's Brief Contra Motion for Summary Judgment filed on March 15, 1999.[4]

6. Plaintiff's Exhibits in Support of Answer to Motion for Summary Judgment filed on March 15, 1999.[5]

7. Defendants' Reply Memorandum filed on April 1, 1999.

8. Supplemental Exhibit in Support of Plaintiff's Brief Contra Motion for Summary Judgment filed on April 20, 1999.

For the reasons set forth below, we will grant summary judgment in favor of the Defendants.

**1.** It is hereinafter referred to as: "Defs.' Mem. at —."

**2.** It is hereinafter referred to as: "Defs.' Ex. at —."

**3.** It is hereinafter referred to as: "Jt. Stip. at ¶ —."

## II. STANDARD OF REVIEW

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* at 248, 106 S.Ct. 2505. All inferences must be drawn and all doubts resolved in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985).

On motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Id.* at 321 n. 3, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *see also First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins. Co.,* 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

**4.** It is hereinafter referred to as: "Pl.'s Br. at —."

**5.** It is hereinafter referred to as: "Pl.'s Ex. at —."

## III. FACTUAL BACKGROUND

Kutztown University is one of the fourteen universities which comprise the Pennsylvania State System of Higher Education ("SSHE"). Jt. Stip. at ¶ 1. There are over 7,000 full and part time students at Kutztown University, almost all from Pennsylvania and the surrounding region. *Id.* Each SSHE university is permitted to have its own local procedures for hiring faculty members. Kutztown University has such local procedures. *See generally* Jt. Stip. at ¶¶ 53–74.

The process for hiring permanent faculty members begins when a department chair submits a completed "Request to Hire Form" to the dean of his or her college. After the approval of the dean, the provost approves the request and a search committee forms. In the Philosophy Department at Kutztown, search committees are comprised of all tenured or tenure-track faculty, except the chair of the department. The chair of the search committee prepares an advertisement, and solicits the input and approval of other members of the search committee. The Philosophy Department's proposed advertisement for a faculty position must also be approved by the dean and the Social Equity Office (formerly called the Affirmative Action Office). After the text of the advertisement is approved, the Social Equity Office determines where the advertisement will be placed. The Philosophy Department search committees routinely ask that their advertisements be placed in *Jobs for Philosophers*. In addition, the University routinely places advertisements for faculty positions in publications such as *The Chronicle of Higher Education, Hispanic Outlook, Women in Higher Education,* and *Black Issues in Higher Education.*

Advertisements for philosophy positions direct candidates to send their applications to the search committee chair. The Philosophy Department secretary creates a file for each application, puts the files in alphabetical order, and sends the names and addresses of the applicants to the Social Equity Office. The Social Equity Office may send a memorandum to the chair of a department's search committee, listing the names of one or more applicants who have identified themselves as women or minorities; asking that their resumes be reviewed; and strongly encouraging the search committee to interview the applicants "if it is determined that they meet the qualifications of the position."

In general, members of search committees must screen a large volume of applications, sometimes numbering in the hundreds, and arrive at a "short list" of 10–20 applicants. Of those, a smaller number will be further evaluated by being invited for an on-campus visit and interview. The dean, the Social Equity Officer and the chair of a departmental search committee all expect to review any departmental short list before the department would be permitted to invite any candidates to Kutztown. In particular, the dean will approve four or five candidates to Kutztown for interviews for a given position.

After the proposed list of interviewees is approved, the search committee chair invites candidates for interviews and makes arrangements for them to come to Kutztown. After the interviews are completed, a majority of the regular full-time department faculty must arrive at a hiring recommendation. The Kutztown Philosophy Department operates by consensus rather than by strict majority vote. At this point, the chair of the search committee completes a "Candidate Approval Form," addressed to the provost. The "Candidate Approval Form" must also be signed by the department chair.

The dean then reviews the Philosophy Department's hiring recommendation and the "Candidate Approval Form" is forwarded to the Social Equity Officer, who is asked to certify that the search complied with the University's affirmative action procedures. Thereafter, the recommendation is sent to the provost and, from there, to the president. The president or his/her designee may accept or reject departmental hiring recommendations, and the deci-

sion of the president or his/her designee is final.

During the 1995–96 search process for the tenure-track position in the Philosophy Department, the Dean of the College of Arts and Sciences was Dr. Brunner and the Provost of the University was Dr. Collings. *Id.* at ¶¶ 3–4. The search committee in the Philosophy Department consisted of three professors, Dr. Lizza, Dr. Ferreira and Dr. Hall. Dep. Hall 1/6/99 at 18. Dr. Ferreira was the chair of the committee and Dr. Back was the chair of the Philosophy Department. *Id.;* Dep. Back 12/11/98 at 25.

At that time, Plaintiff, Dr. Leemon McHenry, had a temporary position in the Philosophy Department. Pl.'s Am. Compl. at ¶ 22. Plaintiff applied for the tenure-track position with the Philosophy Department and was ultimately recommended by the search committee for the position. Decl. Brunner 2/5/99 at ¶ 17. Dean Brunner, however, refused to approve the Plaintiff based on concerns about the Plaintiff's teaching evaluations. *Id.* at ¶ 18. Provost Collings, the designee of President McFarland, agreed with Dean Brunner's reservations. *Id.* at ¶ 30. Thus, the Philosophy Department was asked to find another candidate for hire. *Id.*

The search committee then forwarded the name of Dr. Huang, a Chinese native. Dep. Hall 1/6/99 at 43–44. Dean Brunner and Provost Collings consented to this recommendation and Dr. Huang accepted the tenure-track position for the 1996–97 academic year. Decl. Brunner 2/5/99 at ¶¶ 36–39; Dep. Collings 1/6/99 at 54; Jt. Stip. at ¶ 19.

Plaintiff subsequently filed a complaint charging discrimination against the SSHE with the Pennsylvania Human Relations Commission ("PHRC"), who subsequently forwarded a copy of the complaint to the Equal Employment Opportunity Commission ("EEOC"). Pl.'s Ex. at 162–63. He then requested a Right to Sue Letter which was issued by the Department of Justice ("DOJ") on September 25, 1997.

*Id.* at 155. The first Right to Sue Letter was rescinded by the DOJ on November 5, 1997, and a second Right to Sue Letter was issued on February 13, 1998. *Id.* at 138–39. Plaintiff subsequently filed this present action in federal court on May 12, 1998.

### IV. DISCUSSION

Plaintiff claims that he was denied a tenure-track position for the 1996–97 academic year in the Philosophy Department because he was a victim of discrimination based upon his race and gender. Defendants now move for summary judgment on the ground that the Plaintiff is procedurally barred from bringing his Title VII claim. Moreover, Defendants argue that the decision not to hire the Plaintiff was not the result of discrimination against the Plaintiff in violation of Title VII and 42 U.S.C. §§ 1981, 1983, 1985(3). We will address each of these issues in turn.

### A. Title VII Procedural Bar

Defendants argue that Plaintiff's Title VII claim is procedurally barred because he has failed to file his claim in accordance with 29 C.F.R. § 1601.28. They allege that this action should have been filed within ninety days after the receipt of his Right to Sue Letter issued on August 25, 1997. Defs.' Br. at 40–49; Pl.'s Ex. 155. In response, Plaintiff contends that since his first Right to Sue Letter was rescinded by the DOJ on November 5, 1997, and subsequently reissued on February 13, 1998, the ninety-day period should run after the receipt of his second Right to Sue Letter. Pl.'s Ex. 138–39, 145.

■■ We find that the official ninety-day period began to run from the first, rather than the second Right to Sue Letter. We conclude this because the DOJ has no authority to rescind the first Right to Sue Letter and did so by error on November 5, 1997. Only the EEOC, under certain circumstances, may rescind a Right to Sue Letter when it reconsiders its own determination within the ninety-day period.

*See* 29 C.F.R. § 1601.21; *see also Jackson v. Richards Medical Co.,* 961 F.2d 575, 586 (6th Cir.1992); *Trujillo v. General Electric Co.,* 621 F.2d 1084, 1087 (10th Cir.1980); *Gonzalez v. Firestone Tire & Rubber Co.,* 610 F.2d 241, 246 (5th Cir.1980). The circumstances under which the EEOC may rescind a Right to Sue Letter is so circumscribed, that if the recision is not made pursuant to a reconsideration decision under 29 C.F.R. § 1601.21, it is deemed to be invalid. *Gitlitz v. Compagnie Nationale Air France,* 129 F.3d 554, 557 (11th Cir. 1997). Since there is no statutory authority for the DOJ to rescind a Right to Sue Letter in the first place, we find that the Plaintiff's second Right to Sue Letter issued by the DOJ is invalid.

■ The next issue, therefore, is whether we will allow for the equitable tolling of the ninety-day period from the first Right to Sue Letter. This time limit may be subject to equitable tolling because it is akin to a statute of limitations rather than a jurisdictional bar. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). Under the doctrine of equitable tolling, a plaintiff may sue after "the statutory time period for filing a complaint has expired if they have been prevented from filing in a timely manner due to sufficiently inequitable circumstances." *Seitzinger v. Reading Hosp. & Medical Center,* 165 F.3d 236, 240 (3d Cir.1999). Such circumstances include: where a claimant has received inadequate notice; where a motion for appointment of counsel is pending and equity would justify tolling the statutory period until the motion is acted upon; where the court has led the plaintiff to believe that she had done everything required of her; or where affirmative misconduct on the part of a defendant lulled the plaintiff into inaction. *Baldwin Cty. Welcome Center v. Brown,* 466 U.S. 147, 151, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (citations omitted). The Third Circuit in *Seitzinger* discussed other possible bases for tolling: "when the plaintiff 'in some extraordinary way' was prevented from asserting her right; or when the plaintiff timely asserted her rights in the wrong forum." 165 F.3d at 240.

From one perspective, we do not believe that the Plaintiff should be excused by equitable considerations because he failed to realize that his request for Right to Sue Letter meant that: (1) he would have to file his complaint within ninety days of its receipt; and (2) the request would halt the PHRC investigation. Plaintiff was represented by an attorney who certainly should have known about such standard consequences from requesting a Right to Sue Letter in a Title VII case.[6] *See* 29 C.F.R. § 1601.28. "The usual rule is that attorney errors will be attributed to their clients." *Seitzinger,* 165 F.3d at 240. Here, this misunderstanding is clearly "at best a garden variety claim of excusable neglect" by an attorney that does not merit equitable tolling.[7] *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990).

On the other hand, Plaintiff clearly relied on the DOJ's letter that erroneously stated that his first Right to Sue Letter was rescinded, and was reissued a second on February 13, 1998. Pl.'s Ex. at 138–39, 145. Plaintiff also requested such a reci-

---

6. We find it disturbing that Plaintiff's attorney represents that Plaintiff was unrepresented until March 5, 1998, because such a representation is contrary to the evidence in the record. *See* Pl.'s Br. at 72; Pl.'s Suppl. Ex. 4/20/99. Not only does the Plaintiff testify that he relied on the counsel of his attorney during this period in the fall of 1997, *see* Dep. McHenry 12/2/98 at 110, but his letter to the EEOC, dated June 16, 1997, also states: "[m]y attorney is Mr. Charles Watkins...." *See* Defs.' Ex. U.

7. Plaintiff's additional claim that the EEOC and PHRC failed to properly inform him of the consequences and that he relied on advice by the PHRC to rescind his Right to Sue Letter, *see* Dep. McHenry 12/2/98 at 108–110, does not amount to being purposefully misled or in some extraordinary way being prevented from asserting his rights under the case law. *See, e.g., Cameron v. Wofford,* 955 F.Supp. 1319, 1324 (D.Kan.1997); *Breen v. Norwest Bank Minnesota, N.A.,* 865 F.Supp. 574, 578 (D.Minn.1994).

sion well before the expiration of the first ninety-day period.[8] *See id.* at 153–54. Moreover, it is significant that the Plaintiff exercised due diligence in preserving his legal rights during this period. *See, e.g.,* Pl.'s Ex. 146, 151, 153–54; *see also Baldwin,* 466 U.S. at 151, 104 S.Ct. 1723.

We are inclined to find that Plaintiff is entitled to equitable tolling of the ninety-day limitation from the receipt of his first Right To Sue Letter. We note, however, that we need not reach a conclusion on this issue because Plaintiff ultimately fails to show that genuine issues of material fact remain with respect to his Title VII claim.

## B. Title VII Claim

Even if the Plaintiff was not procedurally barred from bringing his claim under Title VII, we find that he has failed to establish a prima facie case of reverse discrimination. The Plaintiff alleges that the May 1996 decision not to offer him a tenure-track position and the decision to hire Dr. Huang, rather than the Plaintiff, for a tenure-track position constitute unlawful discrimination. Plaintiff is suing Defendants Dr. McFarland, Dr. Collings, Dr. Brunner and the SSHE under Title VII which states: "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The fact that the Plaintiff is white does not deny him protection under Title VII. *See Mc-*

*Donald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 280, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).

■ We note, however, that individual employees may not be held liable under Title VII. *See, e.g., Sheridan v. E.I. Du-Pont de Nemours & Co.,* 100 F.3d 1061, 1077 (3d Cir.1996); *Dici v. Commonwealth of Pennsylvania,* 91 F.3d 542, 552 (3d Cir. 1996). Defendants Dr. McFarland, Dr. Collings and Dr. Brunner are granted summary judgment on the Plaintiff's Title VII claim from the outset. We must still examine, however, whether the SSHE is liable under Title VII.[9]

We largely draw upon our analysis in *Hall v. Kutztown University of the Pennsylvania State System of Higher Education,* No. 96–4516, 1998 WL 10233 (E.D.Pa. Jan.12, 1998), which has similar facts to this case.[10] Plaintiff's claim is not a pure race discrimination claim. Instead, Plaintiff alleges that the tenure-track position was to go to a female and/or minority and he was discriminated against because he is a white male. This being the case, Plaintiff's claim should be treated as a type of sex-plus claim. *See Arnett v. Aspin,* 846 F.Supp. 1234, 1238 n. 4 (E.D.Pa. 1994) (a woman rejected in favor of another woman failed to make out a prima facie case of pure sex discrimination, but may still have alleged a sufficient sex-plus claim); *Hall,* 1998 WL 10233, at *34. A plaintiff proceeding on this theory does not allege discrimination against a protected

---

**8.** This fact is significant because it indicates to the court that the Plaintiff did not wait until the 90-day period had elapsed to then seek a second Right to Sue Letter in order to circumvent the procedural bar created by the first Right to Sue Letter. *Compare Soso Liang Lo v. Pan American World Airways,* 787 F.2d 827, 828 (2d Cir.1986). By analogy, the EEOC has power to reconsider its decision after the issuance of a Right to Sue Letter if the initiation of such a reconsideration occurs during the 90-day period after the first Right to Sue Letter. *See, e.g., Trujillo,* 621 F.2d at 1087; *Gonzalez,* 610 F.2d at 246.

**9.** We note that Kutztown University, which is part of the Pennsylvania SSHE is no longer a

Defendant in this case by stipulation agreed to by both parties on July 23, 1998.

**10.** The facts of *Hall* substantially overlap with this case. 1998 WL 10233, *modified,* slip op. at 1 (E.D.Pa. Feb. 23, 1998) (clarified with respect to the official capacity claim against a particular Defendant). In fact, Dr. Hall was competing for the same tenure-track position in the Philosophy Department for the 1996–97 academic year. *Id.* at *20. Dr. Hall brought a Title VII claim arguing that he was denied such a position on the basis of race and gender. *Id.* at *1. Dr. Hall is also a white, Anglo-Saxon male. *Id.*

class as a whole, but rather discrimination against a certain subclass within the protected class, in this case the subclass of white males. Thus, the Plaintiff's case is neither a pure reverse discrimination case nor a pure sex-plus case, but rather a reverse discrimination sex-plus case. This court has held that a Title VII discrimination claim may be based on a combination of impermissible factors. *See, e.g., Fucci v. Graduate Hospital,* 969 F.Supp. 310, 316 n. 9 (E.D.Pa.1997). Therefore, we find that the Plaintiff has properly brought his claim under Title VII.

In analyzing the Plaintiff's disparate treatment claim, we will apply the four part inquiry outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under *McDonnell Douglas,* a plaintiff must establish four things: (1) the plaintiff belongs to a protected class; (2) the plaintiff applied and was qualified for a position for which the employer was seeking applicants; (3) despite the plaintiff's qualifications, the employer did not select the plaintiff; and (4) non-members of the protected class received more favorable treatment (e.g., the position remained open and the employer continued to seek applications from persons with a plaintiff's qualifications). *Id.* at 802, 93 S.Ct. 1817; *see also Stewart v. Rutgers,* 120 F.3d 426, 432 (3d Cir.1997). Once a plaintiff has established such a prima facie case by a preponderance of the evidence, the burden of production shifts to the defendant to articulate some other legitimate, non-discriminatory reason for the challenged action. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510–511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Assuming that the defendant in turn sustains this burden, the burden of production shifts once more to the plaintiff to show that the proffered non-discriminatory explanation is pretextual. *Id.* at 507–508, 113 S.Ct. 2742.

We agree with the Defendants that the rationale behind the *McDonnell Douglas* test incorporates the assumption that an employer's acts, unless otherwise explained, are likely to be based upon factors which are impermissible. *See Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Case law has held that this assumption should not apply when the plaintiff is a member of a group which has traditionally been favored in society. *See Livingston v. Roadway Express, Inc.,* 802 F.2d 1250, 1252 (10th Cir.1986). This reasoning has caused courts to modify the *McDonnell Douglas* analysis in reverse discrimination cases. *See, e.g., Duffy v. Wolle,* 123 F.3d 1026 (8th Cir.1997); *Harding v. Gray,* 9 F.3d 150, 153 (D.C.Cir. 1993). As articulated by the Court of Appeals for the District of Columbia Circuit:

> The original McDonnell Douglas standard required the plaintiff to show "that he belongs to a racial minority." Membership in a socially disfavored group was the assumption on which the entire McDonnell Douglas analysis was predicated, for only in that context can it be stated as a general rule that the "light of common experience" would lead a factfinder to infer discriminatory motive from the unexplained hiring of an outsider rather than a group member. Whites are also a protected group under Title VII, but it defies common sense to suggest that the promotion of a black employee justifies an inference of prejudice against white co-workers in our present society.

*Parker v. Baltimore & Ohio R.R. Co.,* 652 F.2d 1012, 1017 (D.C.Cir.1981).

Although the Third Circuit has not yet addressed this issue, one lower court has recently held that "to make out a prima facie case of reverse discrimination, a plaintiff must also show background circumstances supporting the suspicion that the defendant is that unusual employer who discriminates against the majority." *Ludovico v. U.S. Healthcare, Inc.,* No. 96–

61, 1997 WL 288592, *5 (E.D.Pa. May 21, 1997). There are, however, a substantial number of lower court cases which do not apply a heightened *McDonnell Douglas* standard. *See, e.g., Ulrich v. Exxon Co., U.S.A.,* 824 F.Supp. 677, 684 (S.D.Tex. 1993); *Stock v. Universal Foods Corp.,* 817 F.Supp. 1300, 1306 (D.Md.1993), *aff'd,* 16 F.3d 411, 1994 WL 10682 (4th Cir.1994) (table); *Lemnitzer v. Philippine Airlines, Inc.,* 816 F.Supp. 1441, 1448 (N.D.Cal. 1992); *Collins v. School District of Kansas City,* 727 F.Supp. 1318, 1322 (W.D.Mo. 1990); *Cohen v. Community College of Philadelphia,* 484 F.Supp. 411, 420 (E.D.Pa.1980). Discrimination is often very difficult to prove. In view of the pervasive nature of affirmative action, it may be time to reexamine the heightened standard.

■ Nevertheless, in view of the holdings of the three circuit courts, we will modify the *McDonnell Douglas* test and impose upon the Plaintiff the burden of establishing that the SSHE tended to discriminate against white males during the relevant time period. It is undisputed that the Plaintiff can satisfy the second and third elements of the *McDonnell Douglas* test. It is clear that the University advertised a tenure-track vacancy for the 1996–97 academic year, and that the Plaintiff applied for this position. Pl.'s Br. at 3; Stipulation 2/10/99 at ¶¶ 59–62. It is also clear that the Plaintiff satisfied the minimum criteria for the position and made the cut to the list of finalists. Defs.' Br. at 22. The parties also agree that the Plaintiff was not hired for the tenure-track position for which he applied. We will therefore focus our analysis on the remaining portions of the modified *McDonnell Douglas* test, namely whether the Plaintiff has established a tendency on the part of the SSHE to discriminate against white males, and whether or not women and minorities received preferential treatment in the hiring process. The Plaintiff can establish this by showing "background circumstances" which support an inference of discrimination. *See Harding,* 9 F.3d at 153. Such background circumstances may take

two forms: "(1) evidence indicating that the particular employer at issue has some reason or inclination to discriminate invidiously against whites ..." and "(2) evidence indicating that there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." *Id.* (citations omitted).

In other words, the Plaintiff will prevail if he can establish either that the SSHE tends to discriminate against white males, or that the circumstances surrounding the decision not to hire him is sufficiently suspect to warrant the conclusion that he was individually discriminated against on account of his race and gender. We will divide the Plaintiff's arguments into these two categories and consider them in turn.

1. Evidence Indicating a Tendency to Discriminate Against White Males

The first element of the *McDonnell Douglas* test traditionally requires a plaintiff to show that he or she is a member of a protected class. As stated above, we will modify this requirement in this case, and require the Plaintiff to show instead that Defendant SSHE tends to discriminate against white males. See *Daly v. Unicare Corp.—Township Manor Nursing Center,* Civ. A. No. 94–6838, 1995 WL 251385, *4 (E.D.Pa. Apr.26, 1995). Although the Plaintiff has alleged only one specific instance of discrimination, we must consider other allegedly discriminatory policies and practices which the Plaintiff claims demonstrates a discriminatory hiring tendency on the part of the SSHE.

■ Plaintiff here is in essence challenging the University's affirmative action policy by claiming that it violates Title VII. We have already discussed the affirmative action policy of the University in our previous opinion. *See Hall,* 1998 WL 10233 at *37–39. We concluded there that even with the "existence of an illegal affirmative action policy which may give rise to a suspicion of discrimination against members of the majority," we are still forced to consider whether the affirmative action

policy was applied so that a tendency existed to discriminate against white males. *Id.* at *37.

The involvement of the Social Equity Office (formerly the Affirmative Action Office) is to ensure that the hiring process includes the affirmative recruitment of minorities and/or women. The Social Equity Office is involved at several stages of the hiring process. The advertisements for faculty positions, for example, are routinely placed in a diverse group of national publications, such as *The Chronicle of Higher Education, Hispanic Outlook, Women in Higher Education,* and *Black Issues in Higher Education.* Jt. Stip. at ¶ 59. After the list is compiled with all applicants who applied for the position, the list will be forwarded to the Social Equity Office which may send a memo to the search committee chair "strongly encouraging" the committee to interview minority and/or female applicants "if it is determined that they meet the qualifications of the position." *Id.* at ¶ 61. For example, in the 1995–96 search, after examining the short list of candidates, the Social Equity Director strongly encouraged that the search committee consider female candidates. Pl.'s Ex. at 19. However, once the decision on the final candidate is made by the committee, the only remaining input of the Social Equity Office involves the certification that the search complied with the affirmative action procedures of the University. Jt. Stip. at ¶¶ 72–73.

After reviewing the involvement of the Social Equity Office in the hiring procedure, it appears that the Social Equity Office's intention is to recruit the broadest possible pool of applicants. It is clear that once the recruitment process is complete, the University is then supposed to hire the most qualified candidate from that pool. Although the Social Equity Office has some authority to ensure that the pool of applicants includes "affirmative" candidates, the Social Equity Office has no say in which of the candidates on the short list will be chosen for any given position. Decl. Peters 2/2/99 at ¶ 13. Thus, the evidence cited by the Plaintiff regarding the functions of the Social Equity Office fails to demonstrate an actual tendency to discriminate against white males.

Moreover, Plaintiff alleges that the tendency to discriminate against white males can be gleaned from a series of documents produced by the University concerning affirmative action. In a series of Annual Reports, the Social Equity Office reports on its actions over the year and identifies as a weakness that "the number of employees from under represented groups are still extremely low" and as a strength "[i]ncrease efforts of the administration to identify and support the hiring of faculty of color and women."[11] *See, e.g.,* Pl.'s Ex. at 48–49. Moreover, Plaintiff points to letters from Provost Richard Collings stating that there is a need to increase the number of minorities and women on the faculty and that ethnicity and gender be seen as part of the qualifications, though certainly not the only ones. Pl.'s Ex. at 50–51. These documents, however, do not really present any evidence in support of the Plaintiff's claim that the SSHE tends to discriminate against white males. Rather, it merely shows that the administrators are generally conscious of and sensitive to social equity issues.[12]

Plaintiff also argues that the University utilizes quotas because of a document from a 1995 Affirmative Action Plan that states:

---

11. Plaintiff also makes much of the fact that the 1993 Annual Report states that the conversion of two tenure track positions were granted to two African–Americans. Pl.'s Ex. at 36. Beyond mere speculation as to the reasons and events surrounding such a conversion, we cannot assume that such an act proves that the SSHE has discriminated against white males.

12. It is worth noting that the affirmative action policies of the SSHE are intended to have a remedial purpose beyond remedying societal discrimination. Such policies are part of ongoing proceedings against the Commonwealth for maintaining a segregated system of public higher education in the past. *See* Decl. Wiley 2/2/99 at ¶¶ 4–9.

"[t]he number of women faculty continues to grow so that we can anticipate meeting this goal of 15 additional women faculty." Pl.'s Ex. at 17. Both Provost Richard Collings and President David McFarland disclaimed any knowledge of these goals. *See* Dep. Collings 1/6/99 at 71–72; Dep. McFarland 1/6/99 at 18–19. The existence of such goals also seems implausible in light of clear statements by the University that its purpose is to "hire the most qualified candidate at Kutztown University." Pl.'s Ex. at 18. While this document states that race and/or gender may be considered as "additional credentials" it is clear that such considerations do not trump other considerations.[13] Decl. Wiley 2/2/99 at ¶¶ 16–17. The University also has clearly disavowed the existence of any set quotas, mandatory set-asides or absolute preferences for members of certain racial groups or genders. *See id.* at ¶¶ 12–13; Decl. Peters 2/2/99 at ¶ 14; Dep. McFarland 1/6/99 at 18; Dep. Collings 1/6/99 at 72–73; Dep. Taliaferro 12/11/98 at 14–15.

In light of all the evidence, we find that no quotas were set by the University. In particular, while the existence of an affirmative action policy is not in dispute, these documents are evidence of "aspirational" policies on affirmative action which does not constitute persuasive evidence of discrimination against the majority. Finally, we agree with the Defendants that Plaintiff has used various "snippets" from documents produced by the Social Equity Office to mischaracterize the hiring procedures at the University. As we stated earlier, there is ample evidence that the Social Equity Office which produces these documents has no final say in the decision to hire a faculty member. Jt. Stip. at ¶¶ 59–74; Decl. Peters 2/2/99 at ¶¶ 13, 15.

Even assuming that illegal affirmative action practices existed, there is no indication that any quotas or set-asides were ever specifically applied or relied upon during the hiring process for positions at the University. *See* Decl. Peters 2/2/99 at ¶¶ 15–16; Dep. McFarland 1/6/99 at 18. While Plaintiff produces a lot of evidence about the aspirational purpose of the University's Affirmative Action Policies and the intention to ameliorate the underrepresentation of certain groups, he fails to show that such policies were actually relied upon in deciding not to hire the Plaintiff or other similarly situated white males.[14] Thus, the evidence presented does not provide persuasive evidence of a tendency on the part of the University to discriminate against white males.

2. Evidence of Discrimination in the Plaintiff's Particular Case

■ The Plaintiff may still establish a prima facie case of reverse discrimination if he can show that "there is something 'fishy'" about the facts of the case at hand that raises an inference of discrimination. *Harding,* 9 F.3d at 153. The Plaintiff claims that the circumstances surrounding the search for a tenure-track faculty member to fill a position in the Philosophy Department for the 1996–97 academic year shows that he was discriminated against because of his race and gender.

---

13. A plan which merely encourages giving consideration to affirmative action concerns when evaluating qualified applicants does not necessarily violate Title VII. While Plaintiff cites to *Taxman v. Bd. of Educ. of the Township of Piscataway,* as support for the claim that nonremedial affirmative action plans are prohibited by Title VII, the facts in *Taxman* are clearly distinguishable from this case. 91 F.3d 1547 (3d Cir.1996). The affirmative recruitment policy and aspirational diversity concerns at Kutztown University are distinguished from the race-conscious decision to first layoff a non-minority school teacher in *Taxman. Id.* at 1551. Moreover, in *Taxman,* the School Board admitted that its affirmative action program was not to remedy the effects of past employment discrimination, *see id.* at 1563, while here racial segregation existed in Pennsylvania state-owned and state-related colleges and universities. *See* Decl. Wiley 2/2/99 at ¶¶ 4–12.

14. It is worth noting that eleven out of twenty tenure-track positions at the University went to white males during the years of 1994–97. Decl. Brunner 2/5/99 at ¶¶ 41–43.

The vacancy for the 1996–97 tenure-track position in the Philosophy Department was advertised in the fall of 1995 and over 400 individuals applied for the position. The search committee consisted of Dr. Ferreira, Dr. Hall and Dr. Lizza and Dr. Ferreira was the chair of the search committee. Dep. Hall 1/6/99 at 18. The chair of the Philosophy Department, Dr. Back, did not sit on the search committee, but was involved in providing approval for candidates. *See* Jt. Stip. at ¶ 56; Dep. Back. 12/11/98 at 25.

The Social Equity Office was also involved in the search process for finding candidates for the 1996–97 tenure-track position. Decl. Peters 2/2/99 at ¶ 2. Ms. Peters, who was the acting Social Equity Officer at that time, worked with the search committee by urging that they adhere to standard documentation protocol, *see id.* at ¶¶ 5, 7b, facilitate advertising in the "Minority and Women Doctoral Directory," *see id.* at ¶ 7a, and make recommendations that certain minority candidates should be interviewed. *Id.* at ¶ 7c; Pl.'s Ex. 67. Moreover, Ms. Peters along with Dean Brunner was involved in approving the short-list of candidates to be interviewed in making sure that the list was "inclusive." Jt. Stip. at ¶ 65; Decl. Brunner 2/5/99 at ¶ 12; Decl. Peters 2/2/99 at ¶ 10–11, 13.

After interviewing several candidates, the Philosophy Department search committee and department chair recommended the appointment of the Plaintiff in May of 1996. Decl. Brunner 2/5/99 at ¶ 17. Dean Brunner refused to approve his appointment because he was concerned about the quality of the Plaintiff's teaching: "[f]rankly, I expected more of him because he had quite a few years of experience." [15] *Id.* at ¶ 18. The search committee tried to persuade Dean Brunner to reassess Plaintiff's teaching evaluation, but the committee and Dean Brunner failed to reach any kind of consensus. *Id.* at ¶ 27; Dep. Lizza 12/11/98 at 23; Dep. Hall 1/6/99 at 31. Provost Collings agreed with Dean Brunner's reservations and they requested that the Philosophy Department to find another candidate for hire. *Id.* at ¶ 30.

The Philosophy Department exercised its right to request a written explanation pursuant to the 1990–96 SSHE–APSCUF collective bargaining agreement. *Id.* at ¶ 31–32, Attach. 8–9. Both Dean Brunner and Provost Collings reiterated in written explanations their reasons for why they were unwilling to support Plaintiff's candidacy. *Id.* The search committee and Dr. Back then forwarded the name of Dr. Huang. Dep. Back 12/11/98 at 42. While Dr. Huang was not initially a unanimous choice, the Philosophy Department eventually reached consensus on recommending

---

15. While we choose not to address pretext, *see* discussion below at IV.B.3, we note that the rationale for ultimately rejecting Plaintiff's candidacy is entirely credible. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Dean Brunner first expressed his concern about Plaintiff's teaching during a routine evaluation report that Dean Brunner prepared in the March of 1996, two months before his name was forwarded for the tenure-track position. Decl. Brunner 2/5/99 at ¶ 10, Attach. 2. Other members of the committee expressed concern or noted negative evaluations about Plaintiff's teaching ability. Dep. Ferreira 12/11/98 at 7–10; Dep. Hall 1/6/99 at 30, 36.

While the evaluation of Plaintiff's teaching ability can be disputed, *see* Dep. Lizza 12/11/98 at 6–7; Dep. Hall 1/6/99 at 47–48, such a dispute does not lead the court to find that an assessment of the Plaintiff by the senior administration as a mediocre teacher should be discredited. It is evident that such a conclusion would be disputed as Plaintiff was the first-choice of some members on the committee. *Id.* at 21; Dep. Hall 1/6/99 at 44. Instead, what is really relevant is whether the refusal to approve the Plaintiff for the tenure-track position by Dean Brunner and Provost Collings was legitimately based on concerns about his teaching capabilities. As discussed above, we find that their refusal to approve the Plaintiff because of the belief that a teacher with fourteen years of experience should have better teaching evaluations, is supported by the evidence. Decl. Brunner 2/5/99 at ¶¶ 18, 39–40, Attach. 2, 4, 8–9; Dep. Collings 1/6/99 at 5–6.

Dr. Huang for the position. *Id.;* Dep. Ferreira 12/11/98 at 77; Dep. Hall 1/6/99 at 43–44. Dean Brunner and Provost Collings consented to the recommendation and Dr. Huang accepted the position. Decl. Brunner 2/5/99 at ¶¶ 36–39; Dep. Collings 1/6/99 at 54.

Plaintiff attempts to prove evidence of bias by painting a picture that affirmative action concerns were underlying the ultimate hiring decision for the 1996–97 tenure-track position. In developing the pool of available candidates for the position, it is clear that affirmative action concerns played some kind of role for most individuals involved in the process. *See, e.g.,* Decl. Brunner 2/5/99 at ¶ 12; Decl. Peters 2/2/99 at ¶¶ 7–8, 10–11; Dep. Lizza 12/11/98 at 19; Dep. Back 12/11/98 at 25–26; *compare* Dep. Hall 1/6/99 at 19–21. Such concerns are congruent with the equity concerns of the University that the list of candidates be inclusive of affirmative candidates.[16] However, at no point did race and gender play a role in the decision as to who would be ultimately fill the tenure-track position. Dean Brunner did not reject the candidacy of the Plaintiff with the knowledge that a minority candidate would next be forwarded for his approval. Decl. Brunner 2/5/99 at ¶ 35. Nor did the committee ultimately decide to forward Dr. Huang's name because he was a minority, but rather, because he was the next choice candidate by consensus, and several individuals' second choice.[17] Dep. Ferreira 1/6/99 at 76–77; Dep. Lizza 12/11/98 at 28; Dep. Back 12/11/98 at 54. As discussed above, the Social Equity Office has no input on the decision of who to hire for the tenure-track position. Decl. Peters 2/2/99 at ¶ 13. In other words, the fact that the administration wanted to make sure that "affirmative" candidates were included in the pool of applicants considered for the position

does not imply that any pressure was exerted upon the committee to hire a woman or minority rather than a white male. *See Duffy,* 123 F.3d at 1039.

Thus, while the candidate eventually hired to fill this position was Chinese, there is no evidence that he was preferred over the Plaintiff because of his race. Dr. Huang came to the application process with very impressive credentials. He was in the process of completing his second doctoral degree at Harvard University, had a long list of publications, some teaching experience and many recommendations. Pl.'s Ex. at 70–73, 78–83. A substantial disparity in the qualifications of a plaintiff who applied for a job and the person who was eventually hired to fill that position may be indicative of reverse discrimination. *See Harding,* 9 F.3d at 153–154. However, we do not find any such disparity when comparing the credentials of the Plaintiff and Dr. Huang. *Compare* Pl.'s Ex. 87–103, 108–114. When over 400 individuals compete for one position, it is natural that many of the top applicants' qualifications will seem similar and the distinctions between such top candidates is subtle. As the hiring process is inherently subjective, individuals involved in the hiring process will differ on how they value qualities such as teaching experience, publications and area of expertise.

Moreover, everyone involved in the search and appointment process was a white male, *see* Jt. Stip. at ¶¶ 2–4, 9–12, so that a generalized animus against white males by those individuals in the hiring process would be "rather extraordinary" and require more evidentiary support. *See, e.g., Duffy,* 123 F.3d at 1039 (stating that for an all-male group of judges to discriminate against male hires would need more substantial evidence to support such

---

16. We note that Ms. Peters has neither the authority nor the expertise to dictate the outcomes of who will be interviewed by the Search Committee. Decl. Peters at ¶ 13. Instead, Ms. Peters is involved in insuring that "affirmative" candidates were being interviewed. *Id.;* Decl. Brunner 2/5/99 at ¶ 12.

17. In fact, Dr. Huang would have made the short-list regardless of his status as a minority candidate. Dep. Ferreira 1/6/99 at 79, 83; Dep. Back 12/11/98 at 52, Ex. D–2.

an extraordinary finding). Thus, the Plaintiff has failed to establish that he was subjected to reverse race and gender discrimination when he applied for a tenure-track position in 1996.

The only arguably preferential treatment which Dr. Huang received has to do with how quickly the Departments recommendation to hire him was approved by the administration. However, Dr. Huang was considering another job offer and needed an answer quickly. Decl. Brunner 2/5/99 at ¶ 36. We credit this explanation and find that Plaintiff has failed to establish by a preponderance of the evidence that the refusal to hire him for the tenure-track position was the product of reverse discrimination.

### 3. Pretext

We need not consider the issue of pretext because the Plaintiff cannot even make out a prima facie case under the modified *McDonnell Douglas* standard applicable to allegations of reverse discrimination. Thus, we need not assess the explanation which the Defendants have offered to justify their refusal to hire the Plaintiff.

### C. §§ 1981, 1983 and 1985(3) Claims

Plaintiff also asserts claims under 42 U.S.C. §§ 1981, 1983, 1985(3) against Defendants, President McFarland, Provost Collings and Dean Brunner, in both their individual and official capacities. He alleg-

es that they violated his right to equal protection as guaranteed by the Fourteenth Amendment. *See* Pl.'s Am.Compl. 5/22/98 at ¶¶ 120–143.

█ The law in the Third Circuit is that the *McDonnell Douglas* framework which is applicable in Title VII cases is likewise applicable to suits involving allegations of racial discrimination under 42 U.S.C. §§ 1981 [18] and 1983.[19] *See Stewart,* 120 F.3d at 432; *Dill v. Commonwealth of Pa., Dep't of Public Welfare,* 3 F.Supp.2d 588, 592 (E.D.Pa.1998). Moreover, the identical analytical treatment of employment discrimination claims brought under 42 U.S.C. §§ 1981 and 1983 is thoroughly set forth in *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).[20] The Court first looked to the history of the 1866 Act and the 1871 Act and found "that Congress intended that the explicit remedial provisions of § 1983 be controlling in the context of damages actions brought against state actors alleging violation of the rights declared in § 1981." *Jett,* 491 U.S. at 731, 109 S.Ct. 2702. The Court went on to state:

> [T]here is very strong evidence that the 42nd Congress which enacted the precursor of § 1983 thought that it was enacting the first, and at that time the only, federal damages remedy for the violation of federal constitutional and statutory rights by state governmental

**18.** Section 1981 provides:

All persons within the jurisdiction of the United States have the same right in every State and Territory to make and enforce contracts, to sue, be parties give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**19.** Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress.

**20.** Our own research reveals that, with the exception of the Ninth Circuit's decision in *Federation of African Am. Contractors v. City of Oakland,* 96 F.3d 1204, 1214 (9th Cir. 1996), our sister circuits are in agreement with the Third Circuit that the 1991 amendments to the Civil Rights Act did not overrule the Supreme Court's holding in *Jett. See, e.g., Dennis v. Cty. of Fairfax,* 55 F.3d 151, 156 n. 1 (4th Cir.1995); *Villanueva v. City of Fort Pierce, Fla.,* 24 F.Supp.2d 1364, 1367–68 (S.D.Fla.1998) (citing numerous Eleventh Circuit district court cases).

actors. The historical evidence surrounding the revision of 1874 further indicates that Congress thought that the declaration of rights in § 1981 would be enforced against state actors through the remedial provisions of § 1983.

*Id.* at 734, 109 S.Ct. 2702. Based on the above reasons, the Court held "that the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of rights guaranteed by § 1981 when the claim is pressed against a state actor." *Jett,* 491 U.S. at 735, 109 S.Ct. 2702. Thus, not only is the analysis of an individual discrimination claim identical under § 1981 and § 1983, but it is also utilizes the *McDonnell Douglas* framework of Title VII.

### 1. Official Capacity

▅▅▅ Plaintiff has sued individual Defendants, David McFarland, Richard Collings and Carl Brunner, in their official capacities. A section 1983 allegation made against a municipality or state officials in their official capacities invokes an entirely different analysis from ascertaining liability of an individual state actor. It has been clearly established that municipalities cannot be sued as an employer that is vicariously liable for an employee under § 1983. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Nor can municipalities be accorded the protection of qualified immunity. *Owen v. City of Independence,* 445 U.S. 622, 650, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

▅▅▅ Local governments and entities, however, may be held liable under

§ 1983 for constitutional violations caused by an official policy or custom of the municipality. *Monell,* 436 U.S. at 694, 98 S.Ct. 2018. Under § 1983, a municipality may be held liable for constitutional violations caused by an official policy or well-settled custom. *Monell,* 436 U.S. at 694, 98 S.Ct. 2018. A municipal custom for § 1983 purposes is such "practices of state officials ... [as are] so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Id.* at 691, 98 S.Ct. 2018 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Municipal liability attaches only when the execution of a government's policy or custom supports a violation of constitutional rights. *Id.* at 691–95, 98 S.Ct. 2018; *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990). Thus, Plaintiff's claim is tantamount to suing the SSHE since suing state officials in their official capacity is equivalent to suing the municipality itself.[21] *See Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

As noted above, the Third Circuit has stated that both § 1981 and § 1983 require the same elements of proof as a Title VII action and the legal standards are interchangeable. In our analysis as to whether the SSHE is liable for reverse discrimination under the *McDonnell Douglas* framework, we found that Plaintiff failed to establish a prima facie case of intentional discrimination under Title VII. In particular, Plaintiff was unable to show that the policies and practices of the SSHE resulted in discriminatory hiring practices. As

---

**21.** Officials may similarly be held liable for instituting an official policy or custom of the municipality. *Monell,* 436 U.S. at 694, 98 S.Ct. 2018. Only those municipal officers and employees who have final policymaking authority can by their action subject their municipal employers to § 1983 liability. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479–80, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Both Dean Brunner and Provost

Collings had final decisionmaking authority as to whether the Plaintiff would be hired for the tenure-track position. *See* Decl. Brunner 2/5/99 at ¶ 12; Dep. Collings 1/6/99 at 4–5. While President McFarland delegated his final policymaking authority with respect to hiring of tenure-track faculty in 1995–96, he does apparently have final authority for the promulgation of general University policies. *See* Dep. McFarland 1/6/99 at 4–5.

we stated in *Hall*, a plan which merely encourages giving consideration to affirmative action concerns when creating a qualified pool of applicants is not per se unconstitutional. 1998 WL 10233 at, *37 (citing *Regents of University of California v. Bakke*, 438 U.S. 265, 316–319, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Powell, J., opinion)); *see also Johnson v. Transp. Agency, Santa Clara Cty.*, 480 U.S. 616, 638, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987). Nor did the policy and practices of SSHE in the hiring process support a violation of the Plaintiff's constitutional right to equal protection. *See Washington v. Davis*, 426 U.S. 229, 239–41, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). As we discussed extensively above, the fact that a Chinese national was eventually hired to fill a position which had been denied to the Plaintiff does not necessarily imply that the Plaintiff was the victim of reverse discrimination. As Plaintiff failed to establish a prima facie case of intentional discrimination from the policy and practices of SSHE, Defendants are granted summary judgment on the official capacity claims brought under §§ 1981 and 1983.

### 2. Individual Capacity

 Plaintiff alleges that Defendants, David McFarland, Richard Collings and Carl Brunner, violated § 1983, which accords private citizens recourse in the wake of constitutional deprivations carried out by officials acting under the color of state law. A section 1983 claim is predicated on two indispensable elements: "(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). It is undisputed that Provost Collings and Dean Brunner were acting under the color of state law during the decisionmaking process for the tenure-

track position for which Plaintiff applied.[22] However, Defendants contend that they are .entitled to qualified immunity as a matter of law because the actions complained of by the Plaintiff fall within the scope of their official office and are therefore discretionary functions.

 Under the doctrine of qualified immunity, the inquiry is ·divided into two separate issues. First; the court must examine whether the conduct of Provost Collings and Dean Brunner violated clearly established constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Second, we must address whether an objectively reasonable person in their position would have known that their conduct would. have violated such constitutional rights. *See id.* The analysis generally turns on the " 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (*"Anderson II"*) (quoting *Harlow*, 457 U.S. at 818–19, 102 S.Ct. 2727). Qualified immunity is applicable even where officials "of reasonable competence could disagree" that such acts were objectively reasonable. *See Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

The Supreme Court has explained what it means by clearly established law for the purpose of qualified immunity:

> The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right.· This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say ... the unlawfulness must be apparent.

*Anderson II*, 483 U.S. at 640, 107 S.Ct. 3034 (citation omitted). Moreover, the

---

**22.** We find that Defendant President McFarland was not acting under the color of state law during the circumstances at issue because

he had delegated any responsibility with respect to the hiring process to Provost Collings. Dep. McFarland 1/6/99 at 4–5.

Third Circuit has held that when there is a lack of substantially similar authority on point, the law cannot be said to be clearly established. *See Sharrar*, 128 F.3d at 810, 828–29; *Johnson*, 150 F.3d at 286; *Pro v. Donatucci*, 81 F.3d 1283, 1292 (3d Cir. 1996).

Here, Plaintiff alleges that he was subject to the intentional discriminatory denial of a tenure-track position based on race and gender. Freedom from race discrimination in the workplace and the guarantees of equal protection are "well guarded in law and widely known to the public." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1479–80 (3d Cir.1990).

■ However, a necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is clearly established is whether the plaintiff has asserted a violation of a constitutional right at all. *See Siegert*, 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998). If the actions of the government official, as alleged by the plaintiff, do not even rise to a level of a constitutional violation, then that official is clearly entitled to qualified immunity. *See In re City of Philadelphia Litig.*, 158 F.3d 711, 719 (3d Cir.1998).[23]

■ As discussed above, Plaintiff has failed to show that a jury could reasonably find that the individual Defendants' conduct amounted to a violation of equal pro-

tection as guaranteed by the Fourteenth Amendment. There is no evidence indicating that Provost Collings or Dean Brunner based the decision to reject Plaintiff's candidacy on his race and gender. The initial efforts to create an affirmative pool of candidates do not amount to conduct which violates the equal protection clause by Provost Collings, Dean Brunner and the Social Equity Office. Hence, the individual Defendants in this case are necessarily entitled to qualified immunity. *See City of Philadelphia Litig.*, 158 F.3d at 719.

### 3. Conspiracy Claim

■ Plaintiff separately alleges that President McFarland, Provost Collings and Dean Brunner conspired together to deprive him of his right to equal protection in violation of 42 U.S.C. § 1985(3).[24] A conspiracy can be found if there exists a conspiracy motivated by a discriminatory based animus for the purpose of depriving any person or class of the equal protection of the law and in furtherance of the conspiracy. *See United Brotherhood of Carpenters & Joiners of America Local 610 v. Scott*, 463 U.S. 825, 828–829, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *Rogin v. Bensalem Township*, 616 F.2d 680, 696 (3d Cir.1980). Plaintiff has failed to prove that a material issue of fact exists as to whether he has been deprived of his equal protection rights under §§ 1981 and 1983. It follows, therefore, that we must grant

---

**23.** There seems to be some confusion as to whether the failure to assert an alleged deprivation of a constitutional right by a plaintiff means that the immunity question need not be reached, *see Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 590 n. 6 (3d Cir.1998), or merely that the official is entitled to qualified immunity. *See City of Philadelphia Litig.*, 158 F.3d at 719. This court decides to follow the latter position as it is supported by a more recent Third Circuit opinion and by other sister circuits. *See, e.g., Jones v. Collins*, 132 F.3d 1048, 1052 (5th Cir.1998); *Roe v. Sherry*, 91 F.3d 1270, 1273–74 (9th Cir.1996).

**24.** Section 1985(3) states:

If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

summary judgment in favor of the Defendants on the § 1985(3) claim.

## V. CONCLUSION

While sympathetic to the plight of Dr. McHenry, tenure-track positions at universities are very competitive and many applicants who are truly qualified are ultimately turned down for tenure-track positions. After reviewing the record, we find that Plaintiff cannot establish a prima facie case of intentional discrimination based on his race and gender. An appropriate order follows.

### *ORDER*

AND NOW, this 10th day of May, 1999, upon consideration of Defendants' Motion for Summary Judgment and Exhibits and Stipulations attached thereto filed on February 10, 1999, Plaintiff's Brief Contra Motion for Summary Judgment and Exhibits attached thereto filed on March 15, 1999, and Defendants' Reply Memorandum filed on April 1, 1999, it is hereby ORDERED that summary judgment is GRANTED in favor of the Defendants and that Plaintiff's Title VII claims and Section 1981, 1983 and 1985(3) claims are thereby DISMISSED. This case is closed.